**TOWN OF SOUTHOLD, Town of Shelter Island, Plaintiffs,**

**Cross Sound Ferry Services, Inc., Plaintiff–Appellant,**

v.

**TOWN OF EAST HAMPTON, Defendant–Appellee.**

**Docket No. 06–0335–CV.**

United States Court of Appeals, Second Circuit.

Argued: Sept. 15, 2006.

Decided: Feb. 8, 2007.

William W. Esseks, Esseks, Hefter & Angel LLP, Riverhead, NY, for Plaintiff–Appellant.

Michael B. Gerrard (Katrina F. Kuh, on the brief), Arnold & Porter LLP, New York, NY, for Defendant–Appellee.

Before CARDAMONE, MINER, and STRAUB, Circuit Judges.

MINER, Circuit Judge.

Plaintiff-appellant Cross Sound Ferry Services, Inc. ("Cross Sound") appeals

from a summary judgment entered in the United States District Court for the Eastern District of New York (Feuerstein, J.) in favor of defendant Town of East Hampton ("East Hampton" or the "Town"). Cross Sound and plaintiffs Town of Southold and Town of Shelter Island (collectively, "Town Plaintiffs") brought this action seeking a declaration that Local Law No. 40 of 1997 of the Town of East Hampton (the "Ferry Law"), which requires ferry operators to obtain a special permit before using a ferry terminal within the Town and restricts the types of ferries that may use local terminals, is unconstitutional. Plaintiffs alleged in their Complaint that the Ferry Law violates the dormant Commerce Clause and Equal Protection Clause of the United States Constitution, as well as the Equal Protection Clause of the New York State Constitution. Plaintiffs also claimed that the law constitutes an improper and abusive exercise of the Town's police power under the laws and Constitution of New York and sought to enjoin its enforcement.

Following joinder of issue, the Town moved for summary judgment dismissing the Complaint pursuant to Federal Rule of Civil Procedure 56. Plaintiffs cross-moved for summary judgment on each cause of action in the Complaint except for their police power claim. Plaintiffs further moved to strike the Town's Rule 56.1 Statement, contending that it was based on inadmissible evidence. The District Court granted the Town's motion and denied plaintiffs' cross motion and their motion to strike the Rule 56.1 Statement. For the reasons that follow, we vacate the judgment of the District Court insofar as it determined that the Ferry Law did not violate the dormant Commerce Clause and remand for further proceedings consistent with this Opinion. We affirm the judgment in all other respects.

## BACKGROUND

Cross Sound is a Connecticut-based corporation that provides interstate ferry service transporting passengers, vehicles, and freight between terminals and docking facilities located in New London, Connecticut and Orient Point in Suffolk County, Long Island. Cross Sound operates seven vehicular ferries that can accommodate vehicles such as buses, trucks, and motor homes together with passengers, as well as one high-speed ferry that carries only passengers and is capable of traveling at greater speeds than vehicular ferries. Cross Sound desires to expand the geographical scope of its operations by instituting ferry service from its existing facilities in New London to those located in the Town of East Hampton. However, the Town of East Hampton currently limits access to its local terminals pursuant to the Ferry Law, a local zoning ordinance prohibiting ferry operators from landing any vehicular or high-speed ferry within the Town, except in cases of emergency. Inasmuch as the Ferry Law would preclude Cross Sound from providing any ferry service in the Town except for low-speed, passenger-only service, Cross Sound's challenge to the law is before us in this appeal.

### I. *Geographical Backdrop*

Long Island is an island in the Atlantic Ocean that comprises the southeasternmost part of New York State. The island juts out eastward from the harbor of New York City for 118 miles and lies parallel to the southern shore of Connecticut, from which it is separated to the north by Long Island Sound. Suffolk County occupies the easternmost portion of Long Island and is bordered to the west by Nassau County. At its eastern end in the Town of Riverhead, Suffolk County splits latitudinally into two peninsulas known as the

North and South Forks, which are separated by Shelter Island Sound. The Town of Shelter Island is an island located in between the forks. The North Fork contains, inter alia, the Town of Southold, which encompasses Orient Point and the Village of Greenport. The South Fork contains, inter alia, the Town of East Hampton. East Hampton, in turn, consists of the Village of East Hampton, a part of the Village of Sag Harbor, and a number of unincorporated hamlets, including Montauk in the easternmost region. The main east-to-west artery, Route 27 or Montauk Highway, provides one traffic lane in each direction throughout most of the Town of East Hampton.

## II. *Ferry Service on Long Island*

Cross Sound provides vehicular and high-speed passenger ferry service between New London and Orient Point on the North Fork. Passengers on Cross Sound's service who wish to proceed further south from Orient Point to East Hampton may take a car, bus, or train 6 miles west to Greenport, board a vehicular ferry to Shelter Island (15 minutes), drive to the southern end of Shelter Island (5 miles), and take another vehicular ferry to Sag Harbor (5 minutes), which straddles the border between the western end of East Hampton and the eastern end of the Town of Southampton. Travel between Connecticut and East Hampton also can be effected by taking a vehicular ferry from Bridgeport, Connecticut to Port Jefferson on the northern shore of Long Island (75 minutes) and then driving to East Hampton (52 miles). In addition, passengers can use the seasonal ferry service between New London and Montauk during May through September.

## III. *The Transportation Element and the Ferry Law*

The Town of East Hampton has been a premier summer resort for many years.

The Town's summertime population has experienced substantial growth since 1970 and increases each year to four or five times the year-round population due to tourism and the presence of seasonal homes. Because travel through East Hampton occurs mainly by way of the Montauk Highway, traffic volumes on the highway during summers are currently at or near capacity. Moreover, traffic on other Town roads during the summer months is rising rapidly at an average rate of 8% per year.

In light of these burgeoning traffic problems, the Town Board of East Hampton ("Town Board" or the "Board") became increasingly concerned with the resulting "serious threat to public health and safety and to the economic vitality and general livability of the Town." In particular, the Board recognized that increased road congestion would be exacerbated by proposed changes to ferry service on the eastern end of Long Island occasioned by the presence of large casinos near New London, Connecticut and the technological developments in the speed and carrying capacities of ferries.

In 1995, the Board imposed a moratorium on the establishment of new ferry service until a comprehensive transportation plan could be completed and thereafter commissioned the first town-wide transportation study since 1966. Following two public hearings, the Board adopted the study as the Transportation Element of its Comprehensive Plan. The Board found that the study confirmed what Town residents already knew: "summertime road traffic in East Hampton has become so heavy as to undermine the Town's rural atmosphere, create very inconvenient and even dangerous driving conditions on the Town's roads, and generally diminish the

quality of life heretofore enjoyed by residents and visitors alike." Specifically, the Transportation Element revealed that "[c]ongestion occurs along Route 27 ... as through traffic competes for available highway capacity with traffic destined for business areas. Particularly in the Village of East Hampton, traffic is slowed when vehicles enter and exit on-street parking spaces, sometimes blocking through traffic for a significant period of time." Recognizing that "there is minimal potential for the existing highway system to accommodate existing traffic, let alone future traffic generated by natural growth and new private developments," the Transportation Element concluded that "a new ferry has the potential to cause a significant degradation in levels of service at roadway intersections providing access to a new terminal site. In many cases, these levels are already poor. As a result, it is recommended that this ferry service not be instituted."

In addition, the Transportation Element evaluated the potential environmental impact of increased traffic in the Town and recommended against the institution of the ferry service on that basis:

[A]ny potential traffic increases on the roadway network providing access to a new ferry terminal will directly impact the environment. This impact will include generation of additional vehicle pollutants and noise. This generation of additional air pollutants is of particular concern, due to the classification of the Nassau–Suffolk Region as a "severe non-attainment" area for ozone, and a "moderate non-attainment" area for carbon monoxide, as a result of the Federal Clean Air Act Amendments of 1990.... The extent of pollutants generated is directly related to average speeds of vehicles on any particular roadway. Any traffic increases on a roadway will lower the average speeds, usually ... resulting in an increase in vehicle emissions.

More vehicular noise is generated by acceleration and deceleration than by travel at constant speeds.

The Board also considered studies showing that high-speed ferries create larger waves that pose safety concerns for boaters and swimmers and have high fuel consumption and air emissions. Finally, the Board recognized that the need for a special use permit even for conventional passenger ferries had become acute in light of findings that the site must have adequate parking and public restrooms available.

In 1997, following a series of public hearings during which Cross Sound submitted comments opposing the moratorium and the Board's proposed action to limit ferry access to its terminals, East Hampton adopted Local Law No. 40, termed the Ferry Law, to address the potential traffic problems posed by "vehicle ferries operating between the Town and the Connecticut shore or ... high-speed, high-volume passenger ferries transporting passengers to the large Connecticut casinos." The Ferry Law, which became effective December 29, 1997, provides, in relevant part:

A. Special Permit required. No person shall construct, commence to use, or substantially expand a passenger ferry terminal, nor commence any passenger ferry service, without having first obtained a special permit pursuant to Article V hereof which specifically authorizes the proposed use and approves the onshore terminal facility to be employed.

B. Vessel limitations. No ferry which has more than two thousand (2,000) installed horsepower and the capability of travel[]ing at a speed in excess of twenty (20) knots, nor any

vehicle ferry of any description, shall dock at or otherwise make use of any passenger ferry terminal, or be allowed to dock at or make use of such facility, except in case of emergency.

These restrictions apply regardless of the origin, destination, or ownership of the ferries utilizing the Town's terminals.

The Ferry Law distinguishes between ferries and excursion boats. The law defines "ferry" to mean "[a] vessel used in the business of carrying passengers between any port or place in the Town of East Hampton and any other port or place without the Town. Compare 'excursion boat.'" In contrast to a ferry, which picks up passengers at one point and drops them off at another, an "excursion" boat is defined as "[a] vessel used on a commercial basis to take passengers to sea from any port or place within the Town of East Hampton, and which returns those passengers to the point of origin without an intervening stop at any port or other land not located in the Town." Excursion boats include boats used on a commercial basis for "party-fishing trips ... sight-seeing trips or tours ..., a dinner cruise vessel, or a vessel employed on gambling trips outside the territorial waters of the State of New York. Compare 'ferry.'"

### IV. *Proceedings in the District Court*

On September 8, 2004, Cross Sound and the Town Plaintiffs commenced the instant action, alleging that the Ferry Law violates the dormant Commerce Clause and the Equal Protection Clause of the federal Constitution, as well as the Equal Protection Clause of the New York State Constitution, and that it constitutes an improper and abusive exercise of the Town's police power under the laws and Constitution of New York.

East Hampton answered and moved for summary judgment dismissing the Complaint on the grounds that the action was barred by the statute of limitations, that plaintiffs lacked standing to bring suit, and that the substantive claims lacked merit. Plaintiffs responded and cross-moved for summary judgment on each cause of action set forth in the Complaint except for their police power claim. Plaintiffs at no time sought discovery under Federal Rule of Civil Procedure 56(f), but they moved to strike the Town's Rule 56.1 Statement of Undisputed Material Facts and challenged the admissibility of several documents submitted in support of the Town's motion.

By Order dated December 21, 2005, the District Court granted the Town's motion and denied plaintiffs' cross motion and motion to strike the Rule 56.1 Statement. *Town of Southold v. Town of E. Hampton,* 406 F.Supp.2d 227, 232 (E.D.N.Y.2005). The District Court first declined to strike East Hampton's Rule 56.1 Statement and ruled that plaintiffs' motion was moot in light of the court's discretion to review the record independently. *Id.* at 234. The court then held that the Town Plaintiffs lacked standing to assert their claims but determined that Cross Sound had third-party standing to raise the claims on behalf of its passengers. *Id.* at 235–38. In addition, the court held that the action was not barred by the statute of limitations. *Id.* at 238.

Turning to the merits of the Complaint, the District Court first addressed Cross Sound's dormant Commerce Clause claims. The court rejected Cross Sound's contentions that the Ferry Law clearly discriminated against interstate commerce and that it was therefore invalid per se, finding instead that the law applied equally to all in-state and out-of-state ferry operators and that Cross Sound failed to identify any local interest favored by it. *Id.* at 239–40.

The court then examined the Ferry Law under the balancing test set forth in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), and concluded that any burden imposed on interstate commerce was not clearly excessive in relation to the local benefits secured, which included better health and safety for Town residents. *Town of E. Hampton,* 406 F.Supp.2d at 240–41. The court held that Cross Sound "failed to even allege" a different burden on interstate commerce than on intrastate commerce and that, in any event, Cross Sound "offered no evidence in support of such allegation." *Id.* at 240 (internal quotation marks omitted). In its analysis, the District Court noted that Cross Sound's Commerce Clause claims were devoted largely to the application of the per se invalidity test and that the Pike analysis was raised in a conclusory fashion only. *Id.*

The court next evaluated the Ferry Law under the Equal Protection Clauses of the federal and New York Constitutions and rejected Cross Sound's claims that the law infringed upon the fundamental right to travel and was therefore subject to strict scrutiny review. *Id.* at 242. Concluding that the law did not implicate the right to travel, the District Court applied rational basis review and determined that the law imposed only minor restrictions upon travel that were rationally related to the Town's interest in protecting its residents. *Id.* at 242–43. Moreover, the court determined that the Ferry Law was not an improper and abusive exercise of East Hampton's police power because it was designed to accomplish legitimate public purposes and was authorized under state laws that empowered towns to enact laws restricting the operation of vessels in their territories. *Id.* at 243–45.

The Town Plaintiffs did not appeal from the ensuing judgment. Cross Sound's timely appeal is now properly before us.[1] See 28 U.S.C. § 1291.

## ANALYSIS

### I. Standard of Review

We review a district court's grant of summary judgment de novo. *Tufariello v. Long Island R.R. Co.,* 458 F.3d 80, 85 (2d Cir.2006). Summary judgment is warranted only upon a showing "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); see *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In assessing the record to determine whether there is such an issue, we view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences and resolving all ambiguities in its favor, and "when cross-motions for summary judgment are filed, 'against the party whose motion is under consideration.'" *Tindall v. Poultney High*

---

1. The Town points out in its brief that a local ferry service operator and the owner of a local terminal in East Hampton have challenged the Ferry Law in a separate action that is currently pending in the Eastern District of New York. See *Francarl Realty Corp. v. Town of E. Hampton,* No. 05 Civ. 1792 (E.D.N.Y. Sept. 14, 2006). The plaintiffs in that action, like Cross Sound here, seek to utilize vehicular and high-speed ferry service within Town waters and raise substantially similar claims in their Complaint. We note that the case is currently on appeal in this Court (Docket No. 06–4737–cv) from an order of the District Court dated September 14, 2006 granting the Town's motion for summary judgment and denying plaintiffs' motion for partial summary judgment.

*Sch. Dist.*, 414 F.3d 281, 284 (2d Cir.2005) (quoting *Boy Scouts of Am. v. Wyman*, 335 F.3d 80, 88 (2d Cir.2003), *cert. denied*, 541 U.S. 903, 124 S.Ct. 1602, 158 L.Ed.2d 244 (2004)).

## II. *Of the Dormant Commerce Clause Claims*

■ The Commerce Clause provides that "Congress shall have Power To ... regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. Art. I, § 8, cl. 3. This express grant of power to Congress contains "a further, negative command, known as the dormant Commerce Clause," *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995), which limits the power of local governments to enact laws affecting interstate commerce. *Hughes v. Oklahoma*, 441 U.S. 322, 326, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979). "The fundamental objective of the dormant Commerce Clause is to 'preserv[e] a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors.'" *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200, 208 (2d Cir.2003) (quoting *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997)). In analyzing a challenged local law under the dormant Commerce Clause, we first determine whether it clearly discriminates against interstate commerce in favor of intrastate commerce, or whether it regulates evenhandedly with only incidental effects on interstate commerce. See *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 217–18 (2d Cir.2004). The term discrimination in this context "means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994).

■ We then apply the appropriate level of scrutiny. A law that clearly discriminates against interstate commerce in favor of intrastate commerce is virtually invalid per se and will survive only if it is "demonstrably justified by a valid factor unrelated to economic protectionism." *Wyoming v. Oklahoma*, 502 U.S. 437, 454, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992). A law that only incidentally burdens interstate commerce is subject to the more permissive balancing test under *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), and will be struck down if the burden imposed on interstate commerce clearly exceeds the putative local gains. The party challenging a law as either clearly discriminatory or violative of Pike bears the threshold burden of demonstrating that it has a disparate impact on interstate commerce— "[t]he fact that it may otherwise affect commerce is not sufficient." *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 75 (2d Cir. 1998).

■ If discrimination is established, the burden shifts to the government to show that the local benefits of the law outweigh its discriminatory effects and that the government lacked a nondiscriminatory alternative by which it could protect the local interests. *USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272, 1281–82 (1995), *cert. denied*, 517 U.S. 1150, 116 S.Ct. 1452, 134 L.Ed.2d 571 (1996). If the challenging party cannot show discrimination, however, it must demonstrate that the law "places a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits.'" *Id.* at 1282 (quoting *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981)).

## A. *Clear Discrimination Against Interstate Commerce*

█ A clearly discriminatory law may operate in three ways: (1) by discriminating against interstate commerce on its face, see, *e.g., Granholm v. Heald,* 544 U.S. 460, 466, 125 S.Ct. 1885, 161 L.Ed.2d 796 (2005) (striking down state laws restricting out-of-state wineries, but not in-state ones, from selling wine directly to consumers in the state); *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.,* 520 U.S. 564, 568, 571, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997) (striking down statute that denied beneficial tax treatment to entities that were "conducted or operated principally for the benefit of persons who are not residents of Maine"); *City of Philadelphia v. New Jersey,* 437 U.S. 617, 618, 629, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978) (striking down statute prohibiting the importation of most "waste which originated or was collected outside the territorial limits of the State"); (2) by harboring a discriminatory purpose, see, *e.g., Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 352–53, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) (striking down facially neutral statute prohibiting state grading from appearing on apple boxes and noting evidence that it was intended to discriminate against Washington apples carrying state grades); *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 269, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984) (striking down facially neutral statute exempting certain locally-produced alcoholic beverages from the excise tax because legislative history showed it was intended to foster local industry); or (3) by discriminating in its effect, see, *e.g., W. Lynn Creamery, Inc. v. Healy,* 512 U.S. 186, 194, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994) (striking down facially neutral law imposing assessment on all milk sold to Massachusetts retailers because its effect on in-state producers was entirely offset by the subsidy provided exclusively to in-state dairy farmers). In our view, the Ferry Law does not offend any of these categories.

█ Initially, the Ferry Law does not facially discriminate against interstate commerce because it is indifferent to the point of origin, destination, and ownership of the restricted types of ferries and applies equally to both in-state and out-of-state ferry operators. Nor is there evidence showing that the Ferry Law was enacted for the purpose of discriminating against out-of-state interests. The record more than supports the District Court's conclusion that the law was not motivated by a discriminatory animus but by the need to address a growing traffic problem in the Town. *Town of E. Hampton,* 406 F.Supp.2d at 239. As set forth in the law's "Findings and Objectives" section, "[t]he revisions contained in this Local Law are intended to improve and strengthen the Town's zoning regulations as they pertain to ferries, and to thereby reduce the potential traffic and other impacts of such uses." The minutes of the Town Board's meetings and correspondence among Town officials confirm this conclusion since they do not evince an improper purpose and relate primarily to the stated salutary purposes of the law.

Cross Sound places great emphasis on the references in the law's "Findings and Objectives" section and internal Town memoranda to Connecticut casinos and the need to curb additional traffic flowing from them. These references, however, do not establish a discriminatory purpose behind the law when they are viewed in light of myriad studies, reports, and conferences indicating that the traffic problem has been increasing since at least 1966, before these casinos even existed, and attributing the problem to numerous other sources, including tourism and the

presence of seasonal homes. Aside from simply reflecting the reality of the Town's traffic situation, the observation that congestion would result from new casino ferry service furnishes additional support for the Town's regulatory measure. Moreover, the Transportation Element raises substantially similar concerns about the potential traffic problem stemming from proposed ferry service from New York City to the Town, suggesting that in-state operators would be restricted by the Ferry Law for the same reasons as operators from Connecticut or anywhere else.

▮ In addition, although the Ferry Law distinguishes between ferries and excursion boats, laws that draw distinctions between entities that are not competitors do not "discriminate" for purposes of the dormant Commerce Clause, because "in the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market there can be no local preference." *Gen. Motors Corp.*, 519 U.S. at 300, 117 S.Ct. 811. Since ferries and excursion boats service different industries, eliminating the distinction in their treatment would not necessarily serve the objective of preserving a national market undisturbed by preferential advantages.

Finally, the Ferry Law is not discriminatory in its effect. The law generally prohibits the operation of vehicular and high-speed ferries in the Town and requires any new ferry entering the Town to obtain a docking permit from the Board. Because these restrictions apply equally to all ferry operators, the Ferry Law lacks an important feature common to those regulations that previously have been found to violate the dormant Commerce Clause—it does not confer a competitive advantage upon local business vis-a-vis out-of-state

competitors. See, *e.g., C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 392, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994) (finding unconstitutional local ordinance requiring that solid waste processed or handled within town be processed or handled at town's transfer station); *South–Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 84, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984) (finding unconstitutional state law requiring all timber to be processed within the state before export); *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 353, 71 S.Ct. 295, 95 L.Ed. 329 (1951) (finding unconstitutional city law requiring milk to be pasteurized within five miles of the city); *Foster–Fountain Packing Co. v. Haydel*, 278 U.S. 1, 13, 49 S.Ct. 1, 73 L.Ed. 147 (1928) (finding unconstitutional state law requiring that local processors remove shrimp heads and hulls before export); *Minnesota v. Barber*, 136 U.S. 313, 329–30, 10 S.Ct. 862, 34 L.Ed. 455 (1890) (finding unconstitutional state law requiring meat sold within state to be examined by state inspector). Unlike these and similar regulations, the Ferry Law does not give any advantage to local businesses at the expense of out-of-state competitors. That the Ferry Law does not discriminate on the basis of geography is amply demonstrated by the fact that even local businesses operating within the Town itself challenge the validity of this law. See *Francarl Realty Corp. v. Town of E. Hampton*, No. 05 Civ. 1792 (E.D.N.Y. Sept. 14, 2006). Accordingly, we discern no clear discrimination in this case.

### B. *The Pike Balancing Test*

▮ Having determined that the Ferry Law does not "patent[ly] discriminat[e]" against interstate commerce, we next assess its validity under the Pike balancing test.[2] *City of Philadelphia*, 437

**2.** Consistent with its approach below, Cross

Sound relies primarily on the per se invalidity

U.S. at 624, 98 S.Ct. 2531. Under *Pike*, a non-discriminatory regulation will be upheld if the burden it places on interstate commerce is outweighed by its local public benefits:

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

397 U.S. at 142, 90 S.Ct. 844 (citation omitted). We have explained that the "incidental" burdens to which *Pike* refers "are the burdens on interstate commerce that exceed the burdens on intrastate commerce." *USA Recycling*, 66 F.3d at 1287. Thus, at a minimum, the challenged regulation "must impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce." *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 109 (2d Cir.2001).

 We have recognized three circumstances in which an evenhanded regulation imposes an incidental burden on interstate commerce: "(1) when the regulation has a disparate impact on any non-local commercial entity; (2) when the statute regulates commercial activity that takes place wholly beyond the state's borders; and (3) when the challenged statute imposes a regulato-

ry requirement inconsistent with those of other states." *United Haulers Ass'n, Inc. v. Oneida–Herkimer Solid Waste Mgmt. Auth.*, 438 F.3d 150, 156–57 (2d Cir.2006), cert. granted, —— U.S. ——, 127 S.Ct. 35, 165 L.Ed.2d 1013 (Sept. 26, 2006); see *Sal Tinnerello & Sons, Inc. v. Town of Stonington*, 141 F.3d 46, 55 n. 9 (2d Cir.1998). Cross Sound does not contend that the Ferry Law operates extraterritorially by regulating commerce wholly beyond New York's borders. Nor does it argue that the law conflicts in any respect with the regulatory requirements imposed by other jurisdictions. Cross Sound's only argument is that the Ferry Law imposes a disparate impact on interstate travelers. As Cross Sound alleges in its Complaint:

> The Ferry Law is protectionist legislation that, facially, in practical effect, and in its purpose, restricts the flow of commerce between New England and the South Fork of Long Island, and forces significant quantities of such commerce to take a more circuitous, more timely and more costly and burdensome route through Southold and Shelter Island. The Ferry Law creates burdens on interstate commerce that are clearly excessive in relation to any putative local benefits. . . .

> The Ferry Law inflicts harm on Cross Sound Ferry's passengers and customers, including by increasing the time and cost of interstate commerce, causing direct competitive harm to businesses engaged in interstate commerce, . . . and decreasing the general health, welfare, and safety of Cross Sound Ferry's passengers and customers. . . .

---

of the Ferry Law and devotes significantly less attention to the *Pike* analysis in its brief. At oral argument, counsel for Cross Sound confirmed his belief that the *Pike* balancing test did not apply because the Ferry Law is clearly discriminatory and explained that no discov-

ery with respect to the alleged interstate burdens and local benefits was sought for that reason. Despite counsel's failure to elaborate upon the *Pike* test, the limited reference to *Pike* in the brief is sufficient to allow us to give full consideration to it here.

The Ferry Law limits the vessel horsepower and capable speed of vessels carrying passengers in interstate commerce that can use any Passenger Ferry Terminal in East Hampton, thereby rendering commercial passenger water carrier service on the waters between New London, Connecticut and East Hampton unfeasible and impractical.

Although the Ferry Law does not clearly discriminate in favor of local interests, Cross Sound claims that it raises the cost of interstate transit because interstate travelers must take an alternate route that is longer and more expensive. The District Court therefore erred when it determined that Cross Sound "has failed to even allege any ... difference" between the burdens on interstate and intrastate commerce. *Town of E. Hampton*, 406 F.Supp.2d at 240 (internal quotation marks omitted). The disparity alleged is that the Ferry Law shifts the burden or cost of traffic from Town drivers onto interstate travelers because intra-Town drivers benefit from reduced traffic volume on the local roads while interstate travelers are denied the most direct route to the Town.

Moreover, in support of its motion for summary judgment, Cross Sound submitted the affidavit of Ronald N. Hill, a traffic engineer, who analyzed the impact of the Ferry Law on interstate travel. Hill opined that the Ferry Law increases trip length for passengers traveling from points in New England to East Hampton and "forces travelers and commerce to take a longer, circuitous, and thus more timely and costly route." The District Court therefore also erred in concluding that Cross Sound "offered no evidence in support of ... an allegation" of disparate impact. *Id.* On the burden side of the *Pike* balancing equation, genuine issues of material fact exist with respect to the degree of the burden on interstate commerce.

Genuine issues of material fact also exist on the benefits side of the Pike equation. Cross Sound contends that any burden on interstate commerce is clearly excessive when compared to the local benefits and relies on Hill's affidavit to challenge the alleged benefits of the Ferry Law. Using data from Cross Sound's reservation database, Hill estimated that vehicular ferry service to the Town would result in an annual reduction of 190,188 vehicle miles traveled ("VMT"). Hill then detailed the resulting positive impacts of the ferry service, including better air quality from reduced VMT, a decrease in traffic at intersections in the western portions of the Town, and improved traffic conditions caused by a reduction of vehicles traveling in the peak direction of traffic flow. Hill opined that the reduction in VMT from the ferry service "translates directly to a reduction in the amount of pollutants emitted by the vehicles on the roadways" and that "[a]ll of the other benefits resulting from that VMT reduction (i.e., reduction of noise and air pollution, lessening of congestion, shorter queuing lines on the Shelter island ferries, etc.) would also accrue." Hill also observed that "ferry service between East Hampton and New England would have further beneficial impacts on traffic patterns," including the "diversion of travelers off the already heavy queues," which "create additional noise and air pollution when they are idling and waiting for the next ferry."

In addition, Hill's affidavit characterized the Transportation Element's findings as a "flawed and inaccurate assessment of the impact of ferry service upon traffic in East Hampton." Hill disputed each of the scenarios used in the Transportation Element to support the enactment of the Ferry Law and criticized the study for failing to

consider other measures to mitigate any traffic burden that might be imposed by the ferry service, such as turning lanes or other roadway improvements. To rebut Hill's affidavit, the Town presented the affidavit of Raymond G. Di Biase, also a traffic engineer, who disagreed with Hill's VMT analysis and supported the conclusions in the Transportation Element.

■ In applying the Pike balancing test, the District Court did not refer to the conflicts in these expert affidavits or engage in any meaningful examination of the claimed local benefits conferred by the Ferry Law. The court simply rejected Cross Sound's claim on the basis that the law "was clearly enacted to further a legitimate local purpose: the promotion of the health and safety of East Hampton's residents." *Id.* While it is true that " 'the judiciary may not sit as a superlegislature to judge the wisdom . . . of legislative policy determinations,' " *N.Y. State Trawlers Ass'n v. Jorling*, 16 F.3d 1303, 1308 (2d Cir.1994) (quoting *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511, (1976)), courts also must be wary of granting summary judgment when conflicting expert reports are presented, *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 79 (2d Cir.2002). We have remanded for further discovery or trial where a party has offered a credible expert affidavit alleging a burden on interstate commerce and challenging the proposed benefits of the law. See *Ass'n of Int'l Auto. Mfrs., Inc. v. Abrams*, 84 F.3d 602, 612–13 (2d Cir.1996) (holding that affidavit of plaintiff's expert challenging "the validity of the legislative assumptions that a stronger bumper will mean less damage and lower insurance premiums" precluded

summary judgment since alleged local benefits of the New York bumper law were disputed). Even the Town appears to recognize that "Cross Sound's critique of the Transportation Element does raise a dispute of fact about the precise extent and manner in which the Ferry Law affects traffic congestion." Defendant–Appellee's Br. at 39–40.

In light of the foregoing, a reasonable fact finder could conclude that the Ferry Law does not actually produce any of its intended benefits so as to justify the potential burden on interstate commerce. Mindful that the District Court may have overlooked some of the evidence before it in part because Cross Sound relied almost exclusively on its clearly discriminatory analysis, we will not "undertake the Pike balancing test in the first instance" and, instead, remand the case for "adequate discovery and further argument by the parties, which will undoubtedly assist the district court in this fact-intensive determination." *United Haulers Ass'n, Inc. v. Oneida–Herkimer Solid Waste Mgmt.*, 261 F.3d 245, 263–64 (2d Cir.2001), *cert. denied*, 534 U.S. 1082, 122 S.Ct. 815, 151 L.Ed.2d 699 (2002).

III. *Of the Equal Protection Clause Claims*

■ Cross Sound also contends that the Ferry Law violates the Equal Protection Clause because it infringes upon its passengers' right to travel.[3] "Freedom to travel throughout the United States has long been recognized as a basic right under the Constitution." *Dunn v. Blumstein*, 405 U.S. 330, 338, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (internal quotation marks omitted). Although "[t]he textual source of the constitutional right to travel,

---

**3.** Because the Equal Protection Clauses of the federal and New York Constitutions are coextensive, see *Pinnacle Nursing Home v. Axelrod*, 928 F.2d 1306, 1317 (2d Cir.1991), our analysis responds to Cross Sound's claims under each of these provisions.

or, more precisely, the right of free interstate migration, ... has proved elusive," *Att'y Gen. of N.Y. v. Soto–Lopez*, 476 U.S. 898, 902, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986), it is apparent from prior cases that the right to travel "occupies a position fundamental to the concept of our Federal Union ... [and] has been firmly established and repeatedly recognized." *Shapiro v. Thompson*, 394 U.S. 618, 630, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (internal quotation marks omitted). The right to travel encompasses at least three different components: "[i]t protects the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *Saenz v. Roe*, 526 U.S. 489, 500, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999). The first of these components is at issue in this case.

 Because laws involving the right to travel often make distinctions between in-state and out-of-state persons, the right "achieves its most forceful expression in the context of equal protection analysis." *Soto–Lopez*, 476 U.S. at 902 n. 2, 106 S.Ct. 2317. When a local regulation infringes upon a constitutionally-protected right, we apply strict scrutiny, requiring the municipality to show that the regulation is narrowly tailored to serve a compelling governmental interest. See, *e.g.*, *Memorial Hosp. v. Maricopa County*, 415 U.S. 250, 254, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974); *Blumstein*, 405 U.S. at 335, 92 S.Ct. 995. Otherwise, the regulation need survive only rational basis review. See, *e.g.*, *Fitzgerald v. Racing Ass'n of Cent. Iowa*, 539 U.S. 103, 107, 123 S.Ct. 2156, 156 L.Ed.2d 97 (2003). As the Supreme Court has explained, a law "implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right." *Soto–Lopez*, 476 U.S. at 903, 106 S.Ct. 2317 (internal quotation marks and citations omitted). Cross Sound argues that the Ferry Law is invalid because it runs afoul of each of these categories. We disagree.

 Initially, unlike laws that condition the availability of benefits on a person's residency within the state, see, *e.g.*, *id.* at 911, 106 S.Ct. 2317 (invalidating state law that denied applicants for state employment additional points for service in armed forces if their entry into armed forces was from another state), the Ferry Law does not use any classification that penalizes a person for their exercise of the right to travel. To the extent that the law differentiates between ferries and excursion boats, it serves to regulate different industries differently and is not a "penalty" against ferry passengers, since other modes of transportation are readily available to them. Cf. *Shapiro*, 394 U.S. at 637, 89 S.Ct. 1322 (striking down state law denying welfare benefits to persons who had not resided for at least one year within the state because less drastic means were available to safeguard against fraudulent receipt of benefits in multiple jurisdictions). Moreover, the law does not distinguish between persons based upon geography. As we determined earlier, the Ferry Law is an evenhanded regulation that applies to in-state ferry providers and passengers as much as it does to out-of-state ones. Thus, if the right to travel is implicated at all, it can be only because the Ferry Law actually deters travel or because impeding travel is its primary objective.

■ While Cross Sound contends that the Ferry Law " 'actually deters' interstate travel by banning an entire mode of interstate transport (i.e., vehicular ferries and high-speed passenger ferries) from East Hampton," Plaintiff–Appellant's Br. at 45, it does not dispute that ferry operators remain free to travel unrestricted to other New York destinations outside of East Hampton, that they still may provide service to East Hampton on permitted types of ferries, or that they may reach points close to East Hampton using the restricted types of ferries and leave their passengers to complete the trip by other modes of transportation. As the District Court properly observed, " 'travelers do not have a constitutional right to the most convenient form of travel[, and] minor restrictions on travel simply do not amount to the denial of a fundamental right.' " *Town of E. Hampton,* 406 F.Supp.2d at 242 (quoting *Cramer v. Skinner,* 931 F.2d 1020, 1031 (5th Cir.1991)); see *Miller v. Reed,* 176 F.3d 1202, 1205 (9th Cir.1999) (stating that "burdens on a single mode of transportation do not implicate the right to interstate travel"); *City of Houston v. F.A.A.,* 679 F.2d 1184, 1198 (5th Cir.1982) (noting that passengers do not possess "a constitutional right to the most convenient form of travel"). The fact that the Ferry Law may make travel less direct for some passengers does not meet the threshold required for strict scrutiny review. See *Kansas v. United States,* 16 F.3d 436, 442 (D.C.Cir.1994) (explaining that "something more than a negligible or minimal impact on the right to travel is required before strict scrutiny is applied") (internal quotation marks omitted).

Moreover, as we already have explained, the history behind the Ferry Law demonstrates that its purpose was not to impede travel but to protect the welfare of Town residents and the integrity of the local environment, and nothing in the record evinces a clear purpose to impede travel from out of state. Based upon the foregoing, the Ferry Law does not interfere with interstate travel so as to implicate a constitutionally-protected right. "If every infringement on interstate travel violates the traveler's fundamental constitutional rights, any governmental act that limits the ability to travel interstate, such as placing a traffic light before an interstate bridge, would raise a constitutional issue." *Cramer,* 931 F.2d at 1031. We therefore apply rational basis review.

■ Under the rational basis standard, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne, Tex. v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). A municipal regulation classification subject to rational basis review " 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.' " *Connolly v. McCall,* 254 F.3d 36, 42 (2d Cir.2001) (quoting *Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)). We are satisfied that the Ferry Law rationally advances legitimate public safety ends by restricting the flow of traffic within East Hampton. Having determined that the Ferry Law does not impermissibly infringe upon the passengers' right to travel, East Hampton need not employ the least restrictive means to achieve those legitimate ends. Accordingly, we agree with the District Court that the Ferry Law does not violate the Equal Protection Clause.

IV. *Of the Police Power Claims*

■ We reject Cross Sound's remaining contention that the Ferry Law is

an improper and abusive exercise of the Town's police power. A municipal zoning ordinance like the one challenged here will not be invalidated unless its provisions are clearly arbitrary and unreasonable and bear "no substantial relation to the public health, safety, morals or general welfare." *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 71 L.Ed. 303 (1926). In support of its claim that the Town Board acted arbitrarily and unreasonably, Cross Sound contends that the Ferry Law was enacted ultra vires because it was not authorized by Town Law §§ 130(17) and 263.

At the time that the Ferry Law was enacted, Town Law § 130(17) authorized towns in New York to create laws "[r]egulating the speed and regulating and restricting the operation of vessels and, in the count[y] of . . . Suffolk the size and horse power of inboard and outboard motors, while being operated or driven upon any waters within or bounding the town to a distance of fifteen hundred feet from the shore." N.Y. Town Law § 130(17)(1)(a) (1997). That section also authorizes the towns to enact laws "[r]estricting and regulating the anchoring or mooring of vessels in any waters within or bounding the town to a distance of fifteen hundred feet from the shore." N.Y. Town Law § 130(17)(1)(b).

In 2000, the New York Legislature amended § 130(17)(1)(a) to authorize towns to "prohibit" personal water craft and specialty prop-craft, namely, jet skis: "regulations may include a prohibition of their use provided such prohibition does not prevent access to federally maintained and designated channels." N.Y. Town Law § 130(17)(1)(a). Cross Sound argues that, by negative implication, East Hampton lacked the authority in 1997 to "prohibit" the operation of any vessels since no prohibitory language was used in relation to them.

In both its previous and current forms, however, Town Law § 130(17)(1)(a) expressly empowers towns to "[r]egulate and restrict[ ]" the operation of vessels, the size and horse power of their motors, the vessels' speed, and their anchoring and mooring. Our reading of the Town Law as endowing towns with the same authority to "prohibit" certain types of vessels as they may prohibit personal water craft comports with the legislative history of the statute. The 2000 amendment was enacted only to clarify the previous scope of the statute and did not rescind the Town's preexisting authority. See Sponsor's Mem. of Sen. Carl L. Marcellino, N.Y. Bill Jacket, 2000 S.B. 5309, Ch. 415 (stating that "[t]he bill would supply clarification of the powers of local governments to regulate personal watercraft" and was motivated by an increase in accidents involving them).

In addition, Town Law § 263 authorizes towns to promulgate regulations "designed to lessen congestion in the streets; to secure safety from fire, flood, panic and other dangers; to promote health and general welfare; . . . to prevent the overcrowding of land; to avoid undue concentration of population; . . . [and] to facilitate the adequate provision of transportation." N.Y. Town Law § 263. While Cross Sound contends that the Ferry Law is invalid because East Hampton has not offered proof that the law will reduce traffic congestion, the record, viewed in the light most favorable to Cross Sound, supports the District Court's conclusion that the law is substantially related to the objectives set forth in the Transportation Element. The law clearly bears a substantial relation to public safety. Accordingly, we conclude that the Ferry law is a proper exercise of the Town's police power.

## CONCLUSION

Based upon the foregoing, the judgment of the District Court is vacated insofar as it granted summary judgment to the Town East Hampton on the dormant Commerce Clause claim, and the case is remanded for proceedings consistent with this Opinion; the judgment is otherwise affirmed.[4]

---

4. We have reviewed Cross Sound's evidentiary objections and find them to be without merit. We therefore discern no error in the District Court's denial of Cross Sound's motion to strike the Town's Rule 56.1 Statement as based on inadmissible evidence. See *Town E. Hampton*, 406 F.Supp.2d at 234.