347 Conn. 101        JULY, 2023        101

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

DIRECT ENERGY SERVICES, LLC, ET AL.
*v.* PUBLIC UTILITIES REGULATORY
AUTHORITY
(SC 20643)

Robinson, C. J., and McDonald, D'Auria,
Mullins, Ecker and Alexander, Js.

*Syllabus*

The plaintiff electric suppliers appealed to the trial court from the final decision of the defendant, the Public Utilities Regulatory Authority (PURA), which imposed certain geographic and marketing restrictions on a renewable energy product known as a voluntary renewable offer (VRO). Electric suppliers serving Connecticut must demonstrate that a minimum percentage of the electricity that they supply is generated by specific types of renewable energy sources. To comply with these minimum standards, electric suppliers can purchase renewable energy credits (RECs), which represent renewable energy produced by third-party generators. PURA had previously established a program allowing customers to support the development of renewable energy sources beyond the minimum standards required. Pursuant to that program, electric suppliers began to offer their customers VROs, whereby the supplier would sell electric generation to the customer and promise to obtain more RECs than are needed to meet the minimum standards, thus allowing the supplier to market its product as more environmentally sound and to command higher prices. Thereafter, in 2020, PURA issued a final decision, establishing the geographic and marketing restrictions on VROs at issue in the present case. The geographic restriction prohibited VROs from containing RECs sourced outside of a particular, permitted control area, which was comprised of all or part of twenty states in and to the south and west of New England, as well as the District of Columbia. This restriction was based on PURA's finding that air quality in Connecticut is significantly and adversely affected by fossil fuel production to the southwest of the New England airshed and that displacing demand for fossil fuel plants in the permitted control area would provide environmental benefits to Connecticut, whereas displacing such demand outside of that area would not. The marketing restriction required electric suppliers to provide clear language informing consumers that a VRO is backed by RECs but is not itself renewable energy. The trial court upheld PURA's final decision. In doing so, it rejected the plaintiffs' claim that the geographic and marketing restrictions violated the dormant commerce clause of the United States constitution. The trial court relied on a recent case, *Allco Finance Ltd.* v. *Klee* (861 F.3d 82), in which the United States Court of Appeals for the Second Circuit rejected a dormant commerce clause challenge to PURA's geo-

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

graphic restriction on the RECs used to satisfy the minimum standards, and reasoned that the challenge to that marketing restriction failed because the plaintiffs had not established a common regulatory scheme sufficient to create a dormant commerce clause issue or that the incidental burdens imposed by the restriction clearly exceeded the local gains. The trial court further concluded that the plaintiffs had waived their claims that the marketing restriction violated their constitutional right to free speech and that PURA's final decision violated their constitutional right to freely contract, insofar as the restrictions would disrupt the expectations and obligations of Connecticut customers and suppliers who had entered into contracts containing automatic renewal provisions, because the plaintiffs had not raised those claims before PURA during the administrative proceedings. Finally, the court rejected the plaintiffs' claim that PURA had violated the procedural requirements of the Uniform Administrative Procedure Act (§ 4-166 et seq.) by improperly relying on certain comments from the Office of Consumer Counsel and the Department of Energy and Environmental Protection that were "nonevidence" to support its findings and conclusions and by failing to make the parties aware of the information on which it would rely to support its final decision. On the plaintiffs' appeal from the trial court's judgment, *held*:

1. The trial court correctly concluded that the challenged geographic and marketing restrictions did not violate the dormant commerce clause:

a. The plaintiffs could not prevail on their claim that the geographic restriction impermissibly discriminated against interstate commerce, insofar as the restriction burdened renewable generating facilities located outside of the permitted control area by denying them access to Connecticut's voluntary renewable market, while allowing generating facilities located within that area access to that market:

This court concluded that the standard applicable to the plaintiffs' claim was not strict scrutiny but, rather, the deferential balancing test articulated by the United States Supreme Court in *Pike* v. *Bruce Church, Inc.* (397 U.S. 137), for laws that are nondiscriminatory but nonetheless adversely and incidentally affect interstate commerce, and, under that test, a law will be sustained unless the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits.

In concluding that the *Pike* balancing test applied, this court utilized the framework set forth in the Second Circuit's decision in *Allco Finance Ltd.*, and this court determined that the geographic restriction did not facially discriminate against electric generators outside of the permitted control area because those generators and generators within the permitted control area were not similarly situated for purposes of the commerce clause, and that the Connecticut market should be given controlling significance because Connecticut has an important and legitimate inter-

347 Conn. 101          JULY, 2023          103

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

est in promoting increased production of renewable power generation in the region, which would further the state's interest in improving the natural environment and, in turn, would serve to protect the health and safety of Connecticut residents, whereas RECs generated outside of the permitted control area would have little to no effect on Connecticut's environment.

Moreover, the RECs generated outside of the permitted control area could still be sold to any Connecticut entity wishing to purchase them at whatever price the market would bear, contrary to the plaintiffs' arguments, RECs for the voluntary renewable program could not be generated anywhere if such credits were to further this state's clean energy goals, the voluntary nature of the VRO program did not render the RECs generated in the permitted control area, which helped to advance this state's environmental goals, the same as those generated outside of that area, which have little to no environmental benefit to Connecticut, and the determination of whether the geographic restriction actually advanced the state's environmental goals was a consideration better suited for PURA or the legislature than for this court.

b. The plaintiffs could not prevail on their claim that the marketing restriction imposed a disproportionate burden on interstate commerce by creating marketing requirements that substantially conflicted with a common regulatory scheme:

Under *Pike*, which, as the parties agreed, governed the plaintiffs' challenge to the marketing restriction, a nondiscriminatory state regulation might impose a disproportionate burden on interstate commerce, in violation of the dormant commerce clause, if the regulation is in substantial conflict with a common regulatory scheme in place in other states, but there must be an actual conflict between the challenged regulation and those in place in other states, and pointing to a risk of conflicting regulatory regimes in multiple states, or increased compliance costs for firms doing business in more than one state, is not enough.

In the present case, even if it was assumed that there existed a common regulatory scheme comprised of federal and sister state law and that the marketing restriction differed from the marketing requirements in other states, as the plaintiffs argued, such a regulatory scheme was not in substantial conflict with the marketing restriction at issue because, to the extent necessary, the plaintiffs could comply with both PURA's marketing restriction and the relevant federal guidelines, and, even if PURA's marketing restriction differed from those of other states, it had no impact on, and did not actually conflict with the implementation of, such other marketing restrictions.

Moreover, the plaintiffs did not clearly articulate the purported burden that the marketing restriction imposed on interstate commerce, they did not claim that the marketing restriction would prohibit them from doing

104 JULY, 2023 347 Conn. 101

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

business in other states, and the only burden that this court could conceive, namely, that there would be increased costs resulting from the need to market VROs differently in Connecticut, was not clearly excessive in relation to the putative local benefits of improving consumer transparency and furthering this state's clean energy goals.

2. This court declined to consider the merits of the plaintiffs' claims involving their constitutional rights to free speech and to freely contract because they were not raised before PURA during the administrative proceedings and, accordingly, were not adequately preserved for review:

The exhaustion of administrative remedies doctrine, which implicates the court's subject matter jurisdiction, typically applies when a party has completely bypassed an available administrative process, whereas, when a party has availed itself of the administrative proceeding but seeks to raise new claims for the first time on appeal, this court generally applies the nonjurisdictional, prudential principle that an appellate tribunal is not required to consider a claim unless it was distinctly raised during the administrative proceeding.

In the present case, the plaintiffs did not entirely bypass the available administrative proceedings but, rather, failed to raise their free speech and contract clause claims before PURA during those proceedings, and, accordingly, such a failure did not constitute a failure to exhaust administrative remedies.

Nevertheless, the plaintiffs' failure to raise their claims during the administrative proceeding deprived PURA of the opportunity to consider them while PURA was developing its final decision and prevented the parties from developing a record regarding those claims, particularly insofar as the plaintiffs never introduced any of the contracts between energy suppliers and consumers that purportedly were infringed by the restrictions, and, thus, those claims were not adequately preserved for appellate review.

Moreover, to the extent the plaintiffs argued that it would have been futile to raise their claims before PURA because they were constitutional in nature and PURA did not have the authority to decide such claims, this court disagreed, concluding that it is not futile to raise a constitutional claim when, as in the present case, the claim challenges the action of the administrative agency, as the agency has the authority to cure any potential constitutional defect with its proposed regulations or may abandon its proposed regulatory changes altogether if those changes cannot be modified in a manner that would address any potential constitutional defect.

3. The plaintiffs could not prevail on their claims that PURA violated their procedural rights under the Uniform Administrative Procedure Act and that their substantial rights were prejudiced:

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

With respect to the plaintiffs' contention that PURA violated the Uniform Administrative Procedure Act by relying on nonevidence to support its findings and conclusions, namely, the comments from the Office of Consumer Counsel and the Department of Energy and Environmental Protection, each comment was submitted prior to the hearing, the plaintiffs failed to raise any objection to the comments at the hearing, and the plaintiffs could have asked, but did not ask, that those statements be offered by a witness and could have provided, but did not provide, evidence to rebut the comments.

With respect to the plaintiffs' contention that they were not aware of certain information on which PURA would rely in issuing its final decision, although this court emphasized that PURA should have disclosed that it intended to take notice of certain scientific facts within its specialized knowledge, this court could not conclude that the plaintiffs satisfied their burden of demonstrating that PURA had violated their procedural rights under the Uniform Administrative Procedure Act or that any violation prejudiced their substantial rights, insofar as the plaintiffs had the opportunity to respond to the testimony of, and to cross-examine, a witness who testified regarding airflow into Connecticut, and to respond to PURA's final decision, which included the challenged factual finding and which referenced PURA's earlier decisions in which it reached the same conclusion.

Argued December 15, 2022—officially released July 4, 2023

*Procedural History*

Appeal from the decision of the defendant establishing a regulatory framework for a certain renewable energy product, brought to the Superior Court in the judicial district of New Britain, where the court, *Klau, J.*, granted the motions to intervene filed by the Office of Consumer Counsel et al.; thereafter, the case was tried to the court, *Klau, J.*; judgment for the defendant, from which the plaintiffs appealed. *Affirmed.*

*Linda L. Morkan*, with whom were *Joey Lee Miranda* and, on the brief, *Benjamin C. Jensen*, for the appellants (plaintiffs).

*Michael K. Skold*, deputy solicitor general, with whom were *Seth Hollander*, assistant attorney general, and, on the brief, *William Tong*, attorney general, and *Clare*

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

*Kindall*, former solicitor general, for the appellee (defendant).

*William E. Dornbos*, legal director, with whom, on the brief, were *Andrew W. Minikowski*, staff attorney, and *Claire E. Coleman*, consumer counsel, for the appellee (intervenor Office of Consumer Counsel).

*Erick M. Sandler*, *Alexander Judd*, *Sophia Browning* and *Hannah Kalichman* filed a brief for Vistra Corporation as amicus curiae.

*Opinion*

McDONALD, J. This case requires us to decide, among other things, whether certain regulations imposed by the defendant, Public Utilities Regulatory Authority (PURA), on energy suppliers within this state violate the dormant commerce clause of the United States constitution.[1] In October, 2020, PURA imposed a series of restrictions on retail electric suppliers who offer customers of this state voluntary products consisting of renewable energy credits (RECs) bundled with electric supply. These products are known as voluntary renewable offers (VROs). The two restrictions relevant to this appeal are the geographic restriction and the marketing restriction. The geographic restriction prohibits VROs from containing RECs sourced outside of particular geographic regions. The marketing restriction requires that suppliers provide clear language informing consumers that a VRO backed by RECs is not "renewable energy" itself but, rather, an energy product backed by RECs.

The plaintiffs, which are all companies that desire to market and sell VROs to Connecticut electric custom-

---

[1] The Office of Consumer Counsel and the Department of Energy and Environmental Protection each filed a motion to intervene as a defendant, which the trial court granted.

347 Conn. 101 JULY, 2023 107

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

ers,[2] contend that the geographic restriction impermissibly discriminates against RECs created outside of the permitted geographic regions. The plaintiffs further contend that the marketing restriction impedes commerce in the national marketplace because it imposes a regulatory requirement inconsistent with those of other states. The plaintiffs also raise a number of other constitutional and procedural claims. For its part, PURA contends that the trial court correctly concluded that neither the geographic restriction nor the marketing restriction violates the dormant commerce clause because, among other things, the restrictions help advance this state's legitimate environmental policy goals and improve consumer transparency.[3] As to the plaintiffs' remaining claims, PURA contends that the trial court correctly concluded that they are either unreviewable or without merit. We agree with PURA and, accordingly, affirm the judgment of the trial court.

Before we set forth the relevant facts and procedural history of this case, we begin with an overview of this state's policies and statutes governing the electric supply industry, which is crucial to our understanding of the plaintiffs' claims. "Until relatively recently, most

---

[2] Specifically, the plaintiffs consist of several retail electric suppliers currently licensed to do business in this state: Direct Energy Services, LLC; Direct Energy Business, LLC; Direct Energy Business Marketing, LLC; and CleanChoice Energy, Inc. An electric supplier trade group, the Retail Energy Supply Association, also participated in the administrative appeal but did not participate in this appeal.

[3] The Office of Consumer Counsel filed a brief in this appeal and largely makes the same arguments and takes the same position as PURA. The Office of Consumer Counsel is an independent government agency designated by statute as the advocate for all consumers of the state's regulated electric, natural gas, water, and telecommunications utilities, as well as the customers of electric suppliers. See General Statutes § 16-2a (a). The Office of Consumer Counsel is an automatically designated statutory party to any contested case initiated by PURA, and it participates in contested cases to advocate for the interests of Connecticut consumers. See General Statutes § 16-2a (a).

state energy markets were vertically integrated monopolies—i.e., one entity, often a state utility, controlled electricity generation, transmission, and sale to retail consumers. . . . Over the past few decades, however, many states, including Connecticut, have deregulated their energy markets. . . . In deregulated markets, [load-serving entities] purchase electricity at wholesale from independent power generators. . . . In order [t]o ensure reliable transmission of electricity from independent generators to [load-serving entities], [the Federal Energy Regulatory Commission (FERC)] has charged nonprofit entities, called Regional Transmission Organizations (RTOs) and Independent System Operators (ISOs), with managing certain segments of the electricity grid. . . . The New England ISO (ISO-NE), [one of] the transmitter[s] involved in this case, manages the grid in most of New England, including all of Connecticut." (Citations omitted; internal quotation marks omitted.) *Allco Finance Ltd.* v. *Klee*, 861 F.3d 82, 88 (2d Cir. 2017) (*Allco*), cert. denied,      U.S.    , 138 S. Ct. 926, 200 L. Ed. 2d 203 (2018).

In deregulating this state's energy market, the legislature created new entities called electric suppliers, which provide electric energy "to end use customers in the state using the transmission or distribution facilities of an electric distribution company . . . ." General Statutes § 16-1 (a) (24); see also General Statutes (Rev. to 2019) § 16-245. Electric suppliers generally do not themselves generate the power that they sell to consumers. See, e.g., *Richards* v. *Direct Energy Services, LLC*, 246 F. Supp. 3d 538, 543 (D. Conn. 2017), aff'd, 915 F.3d (2d Cir. 2019). Rather, they function as a " 'middleman' " in the electricity market by purchasing energy from wholesalers and then selling it to consumers under contract. Id. Suppliers that receive the proper licensing may serve residential, commercial, and industrial customers throughout the state and are active participants in the

347 Conn. 101　　　　JULY, 2023　　　　109

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

retail competitive markets for electricity. The activities of electric suppliers are heavily regulated. PURA hears customer complaints regarding electric suppliers, monitors and takes action to prevent unfair and deceptive practices, and monitors the state of competition in the marketplace. See General Statutes §§ 16-245t, 16-245u and 16-245x.

Among the governing regulations, electric suppliers must satisfy this state's mandatory renewable portfolio standards (RPS). The RPS require electric suppliers to demonstrate that certain percentages of the electricity that they supply have been generated by specific types or classes of renewable energy sources (i.e., solar, wind, hydroelectric, etc.). See General Statutes §§ 16-243q and 16-245a;[4] see also General Statutes § 16-1 (a) (20), (21) and (38). The policy embodied in the RPS obligations "creates a financial incentive for [the] development of renewable energy projects by ensuring a market and steady stream of revenue for renewable generators." Public Utilities Regulatory Authority, Connecticut Renewable Portfolio Standard (last modified November, 2022), available at https://portal.ct.gov/PURA/RPS/Renewable-Port folio-Standards-Overview (last visited June 26, 2023); see General Statutes §§ 16-243q and 16-245a. Electric suppliers can achieve compliance with these minimum standards by purchasing RECs. See General Statutes § 16-245a (b) (1) (A). "RECs are inventions of state property law whereby the renewable energy attributes are unbundled from the energy itself and sold separately." (Internal quotation marks omitted.) *Wheelabrator Lisbon, Inc.* v. *Dept. of Public Utility Control,* 531 F.3d 183, 186 (2d Cir. 2008). Each REC represents one megawatt-hour of renewable energy produced by

―――――――――
[4] Although § 16-245a has been amended since the events at issue in this appeal; see Public Acts 2022, No. 22-118, § 163; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of § 16-245a.

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

a third-party generator. See, e.g., United States Environmental Protection Agency, Renewable Energy Certificate Monetization (last modified February 15, 2023), available at https://www.epa.gov/greenpower/renewable-energy-certificate-monetization (last visited June 26, 2023). As the trial court in this case aptly explained, "RECs are necessary because of a fundamental reality about the generation and distribution of electricity: electrons cannot be traced from their generation source to the end user unless the source is behind the customer's electricity meter. In all other instances, energy produced at a renewable source, and all other sources, flows to the grid and its use is untraceable. . . . Thus, when customers enter into a contract to purchase renewable energy, they are actually agreeing to purchase [RECs] reflecting the [renewable] attributes for that energy." (Citation omitted; internal quotation marks omitted.) Because of the way the power grid is structured in this country, the only power that can physically reach Connecticut consumers is energy generated in either the control area covered by ISO-NE or in an immediately adjacent control area. However, because RECs can be purchased from renewable energy generated anywhere in the country, the energy that suppliers sell to end use consumers in this state is not necessarily the same energy on which the REC itself is based.

Electric suppliers must file an annual report with PURA to demonstrate compliance with the RPS obligations. See Regs., Conn. State Agencies § 16-245a-1 (a) (2020). These annual reports are based on RECs issued exclusively by the New England Power Pool Generation Information System (NEPOOL GIS).[5] See General Stat-

---

[5] NEPOOL GIS "issues and tracks [RECs] for all [megawatt-hours] of generation and load produced in the [ISO-NE] control area, as well as imported [megawatt-hours] from adjacent control areas. In addition to the generation, the NEPOOL GIS provides emissions labeling for the New England load-serving entities by tracking the emissions attributes for generators in the region. In recent years the NEPOOL GIS has adapted to the

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

utes § 16-245a (b); Regs., Conn. State Agencies § 16-245a-1 (c) (2020). The geographic footprint of NEPOOL GIS corresponds to the geographic footprint of ISO-NE. Two other regional systems are relevant to this appeal: the New York Generation Attribute Tracking System (NYGATS), which corresponds to the geographic footprint of the New York Independent System Operator (NYISO), and the PJM Generation Attribute Tracking System (PJM-GATS), which corresponds to the geographic footprint of PJM Interconnection—the RTO of the mid-Atlantic.

Although the RPS are mandatory and set minimum renewable energy standards for most energy sold in this state, in 2005, PURA established the Clean Energy Options Program to enable consumers to support the development of renewable energy sources above and beyond the state's mandatory minimum renewable energy requirements. Electric suppliers responded by developing the VRO. A VRO is a bundled product in which the supplier offers to sell electric generation to a retail end user and promises to obtain additional RECs above and beyond what the supplier needs to meet the state's minimum mandatory renewable energy requirements of the RPS. In other words, the difference between the RPS and the VRO products is that the VRO is backed by more RECs than the supplier uses to meet the mandatory RPS, enabling the supplier to market its product to consumers as a more environmentally sound product that often commands higher prices. As with energy sold under the RPS, the energy delivered under a VRO backed by RECs is not necessarily the same renewable energy that created the REC, and it may not have been generated from renewable sources at all. For years after

various state RPS laws to track combined heat and power, demand response and conservation and load management certificates." NEPOOL Generation Information System, available at https://nepoolgis.com (last visited June 26, 2023).

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

it established the Clean Energy Options Program, PURA did little to monitor the developing VRO market.

With this background in mind, we turn to the facts and procedural history specific to this case. In the decade after the launch of the Clean Energy Options Program, the VRO market grew significantly. As a result, in December, 2016, PURA decided to review the Clean Energy Options Program and to develop new options regarding VROs. Specifically, PURA opened Docket No. 16-12-29, "PURA Development of Voluntary Renewable Options Program." The following month, PURA issued a notice of proceeding, stating that it had initiated the proceeding "to develop options for Connecticut rate-payers to purchase voluntary renewable products and to establish a new program to replace [the Clean Energy Options Program]." (Internal quotation marks omitted.) PURA subsequently clarified that the proceeding "would establish rules that will govern all [VROs], create new rules for [the Clean Energy Options Program], and modify a disclosure label [for all general supply and REC offers]." (Internal quotation marks omitted.) PURA issued formal requests for written comments and then held a virtual hearing in June, 2020, to discuss the billing and other clean energy options issues raised by the electric distribution companies and electric suppliers in their written comments and responses to interrogatories and any other relevant issues. The parties subsequently submitted briefs and reply briefs.

In September, 2020, PURA issued a proposed decision and a notice of written exceptions and oral argument. The plaintiffs and other electric suppliers filed written exceptions "identifying several serious errors of law and fact in the proposed decision." (Internal quotation marks omitted.) PURA held oral argument and thereafter issued its final decision in October, 2020. In its decision, PURA, among other things, (1) established a

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

geographic restriction for RECs used in VROs, and (2) imposed a marketing restriction for VROs.[6]

The geographic restriction prohibits VROs from containing RECs sourced outside of particular geographic regions, specifically the NEPOOL GIS, NYGATS, and PJM-GATS systems (permitted control area). The permitted control area collectively includes all or part of twenty states, namely, Connecticut, Delaware, Illinois, Indiana, Kentucky, Maine, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, Tennessee, Vermont, Virginia, and West Virginia, as well as the District of Columbia. The reason for the geographic restriction lies in the regionalized nature of the adverse environmental concerns. "As the VRO market developed [initially], between 2005 and 2016, companies offering VROs relied on RECs sourced from anywhere in the country and . . . Canada." Over time, PURA determined that restricting the geographic regions from which RECs can be sourced would "bring Connecticut's VROs in line with Connecticut's goals of reducing local greenhouse gas emissions and supporting sustainable local renewable energy sources." (Internal quotation marks omitted.) This is because "Connecticut air quality is significantly and adversely affected by fossil fuel production to the southwest of the New England airshed. Demand for renewable resources that displaces demand for fossil fuel plants to the south and west of New England will provide environmental benefits to Connecticut." (Internal quotation marks omitted.) By contrast, displacement of fossil fuel resources in more distant states, such as Texas and California, provides

_____

[6] In its decision, PURA also imposed other requirements for VRO products, including a resource type restriction, which imposed restrictions on the types of renewable energy sources that suppliers could rely on when selling VROs in this state. These other requirements, however, are not at issue in this appeal.

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

little to no environmental benefits to this state. PURA also explained that "[m]any more customers are participating in . . . VROs now than were fifteen years ago. These customers not only need to fully understand the products for which they . . . may be paying a premium, but [PURA] must also ensure that these products are furthering Connecticut's clean energy goals. [PURA] notes that current VROs contribute minimally, at best, to Connecticut's environmental betterment. . . . [I]n 2016, few VRO products included New England regional RECs. Instead, the majority of these [VROs] relied on nationally sourced [RECs] with no demonstrable benefit to Connecticut or New England; further, claims related to certain nationally sourced RECs may conflict with the goals that consumers likely intend to achieve through their premium." (Citation omitted.)

The marketing restriction imposed by the final decision requires that electric suppliers provide clear language informing consumers that a VRO backed by RECs is not "renewable energy" itself but, rather, is an energy product backed by RECs. A bit of background information is necessary to understand this marketing restriction. "In 2008, acting pursuant to its statutory obligation to provide consumers with certain information"; see General Statutes (Rev. to 2007) § 16-245p (b) (3); "PURA developed a disclosure label applicable to suppliers marketing electric generation to Connecticut customers." During the underlying proceeding, PURA learned that one supplier had provided a disclosure label indicating a renewable energy content of 121 percent. Customers had also expressed confusion about VROs. As a result, PURA determined that the development of the VRO market required changes to the disclosure label requirements. PURA's decision thus prohibits suppliers that market VROs from referring to them as containing renewable energy rather than being backed by RECs. Specifically, PURA explained: "Suppliers may not mar-

ket [REC-based] VROs to mislead consumers [into] believe[ing] they are purchasing renewable energy rather than RECs. As noted herein, there is a clear distinction between certificates and the ownership interest in, or a [power purchase agreement][7] to provide energy from, a renewable source. It is reasonable to display information as representing a renewable source for an offer *if* the supplier owns, or has a [power purchase agreement to provide energy from], these resources *and* is using them to supply the electricity for the offer. It is unreasonable to display this information if the supplier is merely buying the certificates associated with the renewable attributes." (Emphasis in original; footnote added.)

The plaintiffs timely appealed from PURA's final decision to the Superior Court pursuant to General Statutes § 4-183 (a), challenging the decision on "virtually every . . . possible ground under . . . § 4-183 (j)." The trial court ultimately affirmed PURA's final decision. Relevant to this appeal, the trial court concluded that the geographic and marketing restrictions do not violate the dormant commerce clause. Specifically, the trial court concluded that the geographic restriction passed the same test used by the United States Court of Appeals for the Second Circuit in a recent decision in which the plaintiff claimed that this state's geographic restriction on RECs eligible for the RPS program violated the dormant commerce clause. See *Allco Finance Ltd.* v. *Klee*, supra, 861 F.3d 103, 105–107; see also *Pike* v. *Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S. Ct. 844, 25 L. Ed. 2d 174 (1970). The trial court also rejected the plaintiffs' dormant commerce clause challenge to the marketing restriction, reasoning that (1) the plaintiffs failed to

---

[7] "A power purchase agreement is a long-term agreement to buy power from a company that produces electricity." (Internal quotation marks omitted.) E. Rietmann, Comment, "Alternative Solutions to Power Oversupply in the Pacific Northwest," 45 Envtl. L. 207, 228 n.191 (2015).

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

establish that a common regulatory scheme sufficient to create a dormant commerce clause issue existed, and (2) the plaintiffs failed to establish that the incidental burdens imposed by the restriction clearly exceeded the local gains. The court also concluded that the plaintiffs waived their free speech and contract clause claims because they failed to raise those claims before the agency at any point during the contested case. Finally, the trial court concluded that the administrative proceedings did not violate the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq. This appeal followed.

On appeal, the plaintiffs contend that (1) the geographic and marketing restrictions contained in PURA's final decision violate the dormant commerce clause, (2) PURA's final decision violates energy suppliers' right to free speech under the state and federal constitutions, (3) PURA's final decision violates their right under the federal constitution to freely contract, and (4) PURA failed to abide by the procedural requirements of the UAPA. We address each claim in turn.

At the outset, we set forth the standard of review applicable to the plaintiffs' claims. The plaintiffs' claims regarding violations of their constitutional rights present questions of law. See, e.g., *Tele Tech of Connecticut Corp.* v. *Dept. of Public Utility Control*, 270 Conn. 778, 787–88, 855 A.2d 174 (2004). Whether the proceedings before PURA complied with the procedural requirements of the UAPA also presents a question of law. See, e.g., *FairwindCT, Inc.* v. *Connecticut Siting Council*, 313 Conn. 669, 711, 99 A.3d 1038 (2014). Thus, our review of each of the plaintiffs' claims is plenary. See, e.g., *Meriden* v. *Freedom of Information Commission*, 338 Conn. 310, 319, 258 A.3d 1 (2021) ("[c]ases that present pure questions of law . . . invoke a broader standard of review than is . . . involved in deciding whether, in light of the evidence, the agency has acted

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

unreasonably, arbitrarily, illegally or in abuse of its discretion'' (internal quotation marks omitted)).

I

DORMANT COMMERCE CLAUSE CLAIMS

The plaintiffs contend that the geographic restriction impermissibly discriminates against RECs created outside of the permitted control area of the NEPOOL GIS, NYGATS, and PJM-GATS systems. Similarly, the plaintiffs contend that the marketing restriction impedes commerce in the national marketplace because it imposes a regulatory requirement inconsistent with those of other states.[8] We conclude that the geographic and marketing restrictions do not violate the dormant commerce clause.

The commerce clause provides that ''Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the Several States . . . .'' U.S. Const., art. I, § 8, cl. 3. The United States Supreme Court ''has adhered strictly to the principle that the right to engage in interstate commerce is not the gift of a state, and that a state cannot regulate or restrain it.'' (Internal quotation marks omitted.) *Hughes* v. *Alexandria Scrap Corp.*, 426 U.S. 794, 808, 96 S. Ct. 2488, 49 L. Ed. 2d 220 (1976). ''This express grant of power to Congress contains a further, negative command, known as the dormant [c]ommerce [c]lause . . . which limits the power of [state and] local governments to enact laws affecting interstate commerce. . . . The fundamental objective of the dormant [c]ommerce [c]lause is to pre-

___

[8] Vistra Corporation, the parent company for certain Connecticut licensed electric suppliers, filed an amicus curiae brief in support of the plaintiffs' dormant commerce clause claims. It generally agrees with the arguments raised by the plaintiffs and emphasizes that ''the marketing restriction and geographic restriction will harm Connecticut customers and the state's renewable energy goals by driving up prices, increasing customer confusion, and lowering demand without incentivizing new development.''

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

serv[e] a national market for competition undisturbed by preferential advantages conferred by a [s]tate [on] its residents or resident competitors." (Citations omitted; internal quotation marks omitted.) *Southold* v. *East Hampton*, 477 F.3d 38, 47 (2d Cir. 2007). "[T]he negative or dormant implication of the [c]ommerce [c]lause prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace." (Internal quotation marks omitted.) *Allco Finance Ltd.* v. *Klee*, supra, 861 F.3d 102. Recently, the United States Supreme Court reiterated that, at its "very core," the dormant commerce clause prohibits "the enforcement of state laws driven by . . . economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." (Internal quotation marks omitted.) *National Pork Producers Council* v. *Ross*, U.S. , 143 S. Ct. 1142, 1153, 215 L. Ed. 2d 336 (2023).

"In analyzing a challenged [state or] local law under the dormant [c]ommerce [c]lause, we first determine whether it clearly discriminates against interstate commerce in favor of intrastate commerce, or whether it regulates evenhandedly with only incidental effects on interstate commerce." *Southold* v. *East Hampton*, supra, 477 F.3d 47.

"We then apply the appropriate level of scrutiny. A law that clearly discriminates against interstate commerce in favor of intrastate commerce is virtually invalid per se and will survive only if it is demonstrably justified by a valid factor unrelated to economic protectionism." (Internal quotation marks omitted.) Id., quoting *Wyoming* v. *Oklahoma*, 502 U.S. 437, 454, 112 S. Ct. 789, 117 L. Ed. 2d 1 (1992). In other words, such a law is valid "only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives . . . ." (Citations omit-

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

ted; internal quotation marks omitted.) *Dept. of Revenue* v. *Davis*, 553 U.S. 328, 338, 128 S. Ct. 1801, 170 L. Ed. 2d 685 (2008).

If the law is nondiscriminatory, but nonetheless adversely affects interstate commerce "incidental[ly]," we employ a deferential balancing test known as the *Pike* balancing test. See *Pike* v. *Bruce Church, Inc.*, supra, 397 U.S. 142. Such a law will be sustained unless "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." Id.

In short, relevant to this appeal, the dormant commerce clause prohibits laws that (1) "clearly [discriminate] against interstate commerce in favor of intrastate commerce," or (2) violate the *Pike* balancing test by "impos[ing] a burden on interstate commerce incommensurate with the local benefits secured." (Internal quotation marks omitted.) *Freedom Holdings, Inc.* v. *Spitzer*, 357 F.3d 205, 216 (2d Cir. 2004).

A

Geographic Restriction

The plaintiffs contend that the geographic restriction violates the dormant commerce clause because "VROs will be required to use only RECs sourced from the designated local permitted control [area] and, therefore, will be unable to access the largest and most commonly accessed sources of RECs in North America."

We must first determine what level of scrutiny applies to the plaintiffs' claim. The plaintiffs contend that the geographic restriction facially discriminates against interstate commerce because it imposes commercial barriers on renewable generating facilities located outside of the permitted control area and "denies generators located outside [of the permitted control area] access to Connecticut's voluntary renewable market,

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

while allowing access to generating facilities located *in* those areas, [thus] favoring the local generators.'' (Emphasis in original.) PURA contends, among other things, that the trial court correctly concluded that the plaintiffs' challenge to the geographic restriction should be reviewed under the more permissive *Pike* balancing test following the framework set forth in the recent decision of the United States Court of Appeals for the Second Circuit in *Allco Finance Ltd.* v. *Klee*, supra, 861 F.3d 105–106.[9]

*Allco* involved issues similar to those of the present case and arose under similar facts. In *Allco*, a Georgia energy generator claimed that Connecticut's geographic restriction on RECs used to satisfy the mandatory RPS requirements treated in-state and out-of-state generators differently and therefore discriminated against interstate commerce. See id., 102–103. Under this state's RPS program, utilities providing electricity in Connecticut can apply only RECs purchased from ISO-NE and directly adjacent control areas to satisfy their RPS requirements. See id., 93; see also General Statutes § 16-245a (b). These adjacent control areas included NYISO, the Northern Maine Independent System Administrator, Inc., and the provinces of Quebec and New Brunswick in Canada. *Allco Finance Ltd.* v. *Klee*, supra, 861 F.3d 93. The court explained that, ''[a]lthough Connecticut utilities are free to purchase RECs that do not meet these requirements—for example, RECs from generators [that] cannot transmit their energy into the ISO-NE grid pursuant to [NEPOOL GIS] Rule 2.7 (c)—such RECs will not count [toward] their requirements under the RPS.'' Id.

_____

[9] PURA also contends that the plaintiffs' dormant commerce clause claims fail as a facial challenge because the plaintiffs have not identified any in-state suppliers with which they compete, the geographic restriction does not treat out-of-state suppliers differently, and the geographic restriction does not reflect economic protectionism. Because we conclude that the *Pike* balancing test is the proper analysis, we need not address these contentions.

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

The court in *Allco* noted that "Connecticut has articulated several reasons for incorporating these geographic limitations into its RPS program. Central among these is the [s]tate's interest in encouraging the development of new renewable energy generation facilities that are able to transmit their electricity into the ISO-NE grid. . . . Connecticut argues that increased in-region renewable energy production would improve air quality for its citizens and protect them from price and supply shocks that could result if, for example, there was a natural gas shortage or a nuclear power plant were to go [offline]. . . . The state contends that placing regional limitations on RECs, if they are to satisfy the RPS requirement, is necessary if the [RPS] program is to help increase the development of renewable generation facilities that are capable of effectuating these and similar goals." (Citations omitted.) Id.

Allco owned a solar power facility in Georgia and could not use RECs associated with that facility to satisfy this state's RPS requirements because the facility was not located in ISO-NE or a directly adjacent control area. See id., 93–94. Allco argued that the RPS program's geographic restriction violated the dormant commerce clause because the program "facially discriminate[d] . . . [and] ha[d] the purpose or the effect of discriminating against Allco's facility in Georgia . . . ." (Internal quotation marks omitted.) Id., 102. The Second Circuit rejected this claim and noted at the outset of its analysis that "any notion of discrimination assumes a comparison of substantially similar entities" and, "when the allegedly competing entities provide different products . . . there is a threshold question whether the companies are indeed similarly situated for constitutional purposes." (Internal quotation marks omitted.) Id., 103.

To resolve this question and to determine the appropriate level of scrutiny to apply—strict scrutiny or the

*Pike* balancing test—the court in *Allco* applied the three part framework established by the United States Supreme Court in *General Motors Corp.* v. *Tracy*, 519 U.S. 278, 117 S. Ct. 811, 136 L. Ed. 2d 761 (1997), to determine whether the entities were similarly situated. See *Allco Finance Ltd.* v. *Klee*, supra, 861 F.3d 105–106. Applying that framework, the Second Circuit first asked "whether the allegedly competing entities—Allco's Georgia generator, on the one hand, and generators located in ISO-NE and adjacent control areas, on the other—provide different products, i.e., different RECs." Id., 105. The court concluded that the competing entities did provide different products, reasoning that "RECs are inventions of state property law . . . and Connecticut has invented a class of RECs that differs from [the] Georgia facility's RECs . . . . The two products can, therefore, be treated as different, even though they—like the unbundled and bundled gas products in *Tracy*—also have some underlying similarities." (Citations omitted; internal quotation marks omitted.) Id.

Second, the court in *Allco* asked "whether there is a market that only one of the two entities serves, and in which competition would not be increased if the differential treatment of the two entities were removed." Id. The court concluded that there was. Id. The court noted that "Connecticut consumers' need for a more diversified and renewable energy supply, accessible to them directly through their regional grid or indirectly through adjacent control areas, would not be served by RECs produced by Allco's facility in Georgia—which is unable to transmit its electricity into ISO-NE. Further, this market's characteristics—most importantly, the boundaries of the electrical grid to which Connecticut has direct or indirect access—appear to be independent of any effect attributable to the [s]tate's RPS program." (Internal quotation marks omitted.) Id. Thus, the court explained, "there is good reason to assume that any

pricing changes that could result from eliminating the [differential treatment of Allco's Georgia generator] . . . would be inadequate to serve the goals that Connecticut properly is pursuing. . . . This suggests that competition would not be served by treating the different types of REC producers similarly." (Citation omitted; internal quotation marks omitted.) Id., 106.

Finally, the court in *Allco* asked "whether there is also a separate market in which these two types of producers compete, and in which competition potentially would be served if Connecticut were prohibited from treating them disparately." Id. The court answered this question in the affirmative. Id. The court explained that PURA conceded that "there is a national market for RECs that does not distinguish between RECs on the basis of their geographic origin. In this market, the respective sellers . . . apparently do compete and may compete further. . . . Eliminating Connecticut's RPS program's differential treatment might well intensify competition . . . for customers in this [national] market. . . . This, of course, cuts in favor of treating the products as alike." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id.

As a result of the dilemma created by the existence of both a market that only one of the two entities serves and also a separate market in which these two types of producers compete, the court in *Allco*—following the United States Supreme Court's analysis in *Tracy*—asked "whether the opportunity for increased competition between REC producers in the national market necessitates treating [REC producers] in Georgia and New England alike for dormant [c]ommerce [c]lause purposes, or whether the needs of Connecticut's local energy market permits treating the two types of REC producers differently." Id. This inquiry asks whether a court should give " 'controlling significance' " to the market in which the two types of REC producers compete,

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

or to the market served only by REC producers that can connect to Connecticut's power grid. Id. Applying this "controlling significance" principle, the court concluded that "a number of reasons support[ed] a decision to give greater weight" to the generators that satisfy Connecticut's RPS requirements for RECs and, therefore, to treat those generators and Allco's Georgia generator as dissimilar for purposes of the dormant commerce clause. (Internal quotation marks omitted.) Id.

Significantly, the court held that the reasons justifying the differential treatment included the environmental, public health and safety similarities between the claim raised in *Allco* and the claim raised in *Tracy*: "Just as the [court in *Tracy*] recognized the importance of Ohio's interest in protecting the captive natural gas market from the effects of competition in order to promote public health and safety . . . so must we here recognize the importance of Connecticut's interest in protecting the market for RECs produced within the ISO-NE or in adjacent areas. Connecticut's RPS program serves its legitimate interest in promoting increased production of renewable power generation in the region, thereby protecting its citizens' health, safety, and reliable access to power." (Citation omitted.) Id. On this point, the court in *Allco* reiterated the Supreme Court's conclusion in *Tracy* that "health and safety considerations [may] be weighed in the process of deciding the threshold question whether the conditions entailing application of the dormant [c]ommerce [c]lause are present . . . ." (Citation omitted; internal quotation marks omitted.) Id., 107. The court also noted that "[t]hese means and ends are well within the scope of what Congress and FERC have traditionally allowed the [s]tates to do in the realm of energy regulation." Id., 106.

Moreover, the court in *Allco* found it significant that the "FERC itself . . . has instituted a sort of regional-

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

ization of the national electricity market [through the geographic lines drawn by ISOs and RTOs]. And neither FERC nor Congress has given any indication that this structure is unduly harmful to interstate commerce.'' Id., 107. The court reasoned that FERC and Congress are better equipped to ''determine the economic wisdom and the health and safety effects of these geographic boundaries that Connecticut has incorporated into its RPS program. It is they that, in this setting, are best suited to decide which products ought to be treated similarly, and which should not.'' Id.

The court in *Allco* concluded that ''Connecticut's regulatory response to the needs of the local energy market has resulted in a noncompetitive REC product that is capable of being produced only by in-region generators, and that this distinguishes such generators from Allco's Georgia generator to the point that the enterprises should not be considered similarly situated for purposes of a claim of facial discrimination under the [c]ommerce [c]lause.'' (Internal quotation marks omitted.) Id. Accordingly, the court applied the *Pike* balancing test; see *Pike* v. *Bruce Church, Inc.*, supra, 397 U.S. 142; and concluded, ''for the same reasons'' discussed in the *Tracy* analysis, that ''Connecticut's RPS program is . . . not clearly excessive in relation to the putative local benefits, and therefore passes the more permissive *Pike* test.'' (Internal quotation marks omitted.) *Allco Finance Ltd.* v. *Klee*, supra, 861 F.3d 107.

We find the *Allco* analysis and rationale persuasive for purposes of analyzing whether PURA's geographic restriction on the RECs eligible to back the VRO program violates the dormant commerce clause.[10] Accord-

---

[10] The trial court similarly concluded that the *Allco* analysis ''point[ed] the court in the direction of the *Pike* test.'' Exhibiting commendable candor, the court acknowledged ''that it . . . reached that conclusion without the highest level of confidence'' given that ''[t]he answer is hardly obvious, the relevant case law is less than a model of clarity, and the deeply technical nature of this case adds its own challenges.'' The trial court's uncertainty in this area reflects the fact that ''the United States Supreme Court's dormant

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

ingly, to determine what level of scrutiny to apply to the plaintiffs' claim, we begin our analysis in the present case by asking whether the allegedly competing entities—renewable energy generating facilities located outside of the permitted control area, on the one hand, and renewable energy generating facilities located within the permitted control area, on the other—provide different products.[11] We conclude that they do. As in the RPS program, RECs used to support the VRO program are "inventions of state property law . . . ." *Wheelabrator Lisbon, Inc.* v. *Dept. of Public Utility Control*, supra, 531 F.3d 186. PURA has decided to create restrictions on the class of RECs used to satisfy a VRO product that are distinct from RECs produced outside of the permitted control area. From the state's perspective, RECs created in the permitted control area differ from RECs created outside of this area because they displace fossil fuel generation with a more direct impact on this state's environment. Although there are

---

commerce clause jurisprudence is less than a model of clarity . . . ." *MERSCORP Holdings, Inc.* v. *Malloy*, 320 Conn. 448, 472, 131 A.3d 220, cert. denied, 580 U.S. 959, 137 S. Ct. 372, 196 L. Ed. 2d 291 (2016); see also *Comptroller of the Treasury* v. *Wynne*, 575 U.S. 542, 574, 135 S. Ct. 1787, 191 L. Ed. 2d 813 (2015) (Scalia, J., dissenting) ("One glaring defect of the negative [c]ommerce [c]lause is its lack of governing principle. Neither the [c]onstitution nor our legal traditions offer guidance about how to separate improper state interference with commerce from permissible state taxation or regulation of commerce. So we must make the rules up as we go along. That is how we ended up with the bestiary of ad hoc tests and ad hoc exceptions that we apply nowadays . . . ." (Citations omitted.)). Indeed, the United States Supreme Court's recent case addressing the dormant commerce clause—which is comprised of five separate opinions—only adds to the murky state of the law. See *National Pork Producers Council* v. *Ross*, supra, 143 S. Ct. 1142.

[11] PURA contends that the plaintiffs have not identified any in-state suppliers with which they compete, and, therefore, their dormant commerce clause claim fails. The plaintiffs contend that the geographic restriction constitutes facial discrimination because electric suppliers are denied access to RECs from generators outside of the permitted control area to serve their Connecticut customers. As we explained, because we conclude that the plaintiffs' claim fails even applying the *Pike* balancing test, we need not address this contention. See footnote 9 of this opinion.

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

undoubtedly similarities between the two different classes of RECs, the two classes can be treated differently for dormant commerce clause purposes.

Second, we must determine whether there is a market that only one of the two entities serves and in which competition would not be increased if the differential treatment of the two entities were removed. We agree with the trial court that eliminating the differential treatment of RECs based on their geographic source would be inadequate to serve this state's VRO program goals. This is because "eliminating different treatment of far-flung RECs would do little to improve Connecticut's chances of reaching its ambitious environmental and energy goals."[12] (Internal quotation marks omitted.) The geographic restriction "further[s] Connecticut's energy policies by reducing local greenhouse gas emissions and [by] supporting local, sustainable, renewable energy sources . . . ." Balancing the various interests at stake, PURA determined that the geographic restriction would "provide environmental benefits to New England, given prevailing wind patterns, and [the permitted control area] is large enough to obtain RECs from affordable clean resources." (Internal quotation marks omitted.) This militates against treating the different types of REC producers similarly.

Third, we conclude, as the court did in *Allco*, that there is a national market for RECs that does not distinguish between RECs on the basis of their geographic

---

[12] PURA noted in its final decision that "[General Statutes] § 22a-200a requires Connecticut to reduce statewide greenhouse gas emissions to 80 percent below 2001 levels by 2050. Additionally, in Executive Order No. 3, Governor [Ned] Lamont has directed [the Department of Energy and Environmental Protection], in consultation with PURA, to analyze and recommend strategies for achieving a 100 [percent] zero carbon target for the electric sector by 2040. . . . These are ambitious goals and meeting them requires [PURA] to revisit its policies surrounding . . . VROs to ensure these offerings contribute to the goals." (Citation omitted; internal quotation marks omitted.)

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

origin. PURA does not contend otherwise. Eliminating the VRO program's differential treatment may intensify competition between REC generators for customers in the national market. This militates in favor of treating the products alike.

Given that there is both a market that only one of the two entities serves, Connecticut, and also a separate national market in which these two types of producers compete, we must decide which market should have " 'controlling significance' . . . ." *Allco Finance Ltd.* v. *Klee*, supra, 861 F.3d 106. For many of the reasons articulated in *Allco*, we conclude that controlling significance should be given to the Connecticut market. Specifically, Connecticut has an important and legitimate interest in promoting increased production of renewable power generation in the region. This interest furthers the state's interest in improving the natural environment, which, in turn, will help protect the health and safety of this state's residents. RECs generated outside of the permitted control area have little to no effect on this state's environment. Indeed, the administrative record includes testimony from Robert A. Maddox, Jr., a representative of one of the suppliers under the Clean Energy Options Program, that "the airflow into Connecticut tends to come . . . from the west [toward] Connecticut. We know we're a tailpipe state, and most of the pollution coming in the state comes from downwind. So, when we can support the development of a renewable energy project in Pennsylvania, that helps clean up Connecticut's air. I don't necessarily know if the development of a renewable energy project north of Montreal [in Canada] does a lot for Connecticut's air." As both the United States Supreme Court and the Second Circuit have explained, "health and safety considerations [may] be weighed in the process of deciding the threshold question whether the conditions entailing application of the dormant [c]ommerce [c]lause are

347 Conn. 101 JULY, 2023 129

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

present.'' *General Motors Corp.* v. *Tracy*, supra, 519
U.S. 307; accord *Allco Finance Ltd.* v. *Klee*, supra, 107.
At least one case has recognized that environmental
goals have health and safety implications for purposes
of a dormant commerce clause claim. See *United Haul-
ers Assn., Inc.* v. *Oneida-Herkimer Solid Waste Man-
agement Authority*, 550 U.S. 330, 346–47, 127 S. Ct.
1786, 167 L. Ed. 2d 655 (2007) (plurality opinion)
(county "flow control" ordinances benefited public by
increasing recycling, which confers "significant health
and environmental benefits"); see also *Huron Portland
Cement Co.* v. *Detroit*, 362 U.S. 440, 442, 80 S. Ct. 813,
4 L. Ed. 2d 852 (1960) ("The ordinance was enacted
for the manifest purpose of promoting the health and
welfare of the city's inhabitants. Legislation designed
to free from pollution the very air that people breathe
clearly falls within the exercise of even the most tradi-
tional concept of what is compendiously known as the
police power."). The commerce clause "does not ele-
vate free trade above all other values"; (internal quota-
tion marks omitted) *United Haulers Assn., Inc.* v.
*Oneida-Herkimer Solid Waste Management Authority*,
supra, 344; and it is not an "[invitation for courts] to
rigorously scrutinize" state regulations designed to pro-
tect public health and safety. Id., 347 (plurality opinion).

Moreover, the United States Supreme Court has
emphasized the significant role that states have in regu-
lating the electric utility industry within its borders.
See, e.g., *New York* v. *Federal Energy Regulatory Com-
mission*, 535 U.S. 1, 24, 122 S. Ct. 1012, 152 L. Ed. 2d
47 (2002) ("FERC has recognized that the [s]tates retain
significant control over local matters even when retail
transmissions are unbundled"); *Arkansas Electric
Cooperative Corp.* v. *Arkansas Public Service Commis-
sion*, 461 U.S. 375, 377, 103 S. Ct. 1905, 76 L. Ed. 2d 1
(1983) ("the regulation of utilities is one of the most
important of the functions traditionally associated with

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

the police power of the [s]tates”); see also *Entergy Nuclear Vermont Yankee, LLC* v. *Shumlin*, 733 F.3d 393, 417 (2d Cir. 2013) (“[S]tates have broad powers under state law to direct the planning and resource decisions of utilities under their jurisdiction. States may, for example, order utilities to build renewable generators themselves, or . . . order utilities to purchase renewable generation.” (Internal quotation marks omitted.)). We find it significant that, in addition to the important role states play in regulating the electric utility industry within their borders, the specific restriction at issue is within the scope of what Congress and FERC have traditionally allowed the states to do in the area of energy regulation. Similar to the geographic restriction for the RPS program, the geographic lines drawn by the restriction in the present case mirror the geographic lines drawn by FERC.[13] See *Allco Finance Ltd.* v. *Klee*, supra, 861 F.3d 107 (“FERC itself . . . has instituted a sort of regionalization of the national electricity market [through the geographic lines drawn by ISOs and RTOs]. And neither FERC nor Congress has given any indication that this structure is unduly harmful to interstate commerce.”). “It is FERC that has created the geographic distinctions on which Connecticut’s program is predicated by organizing owners of transmission lines into [ISOs], such as ISO-NE, and [RTOs] in order to help manage the grid, ensure system reliability, and guard against discrimination and the exercise of market power in the provision of transmission services.” (Internal quotation marks omitted.) Id., quoting *Entergy Nuclear Vermont Yankee, LLC* v. *Shumlin*, supra, 413. Furthermore, NEPOOL GIS, which

---

[13] We note that the geographic restriction for the RPS is more restrictive than the geographic restriction for the VRO program. RECs for the RPS must be sourced from either ISO-NE or an immediately adjacent control area; see *Allco Finance Ltd.* v. *Klee*, supra, 861 F.3d 93; accord General Statutes § 16-245a (b); whereas RECs for the VRO program may be sourced from ISO-NE, NYISO, or PJM.

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

issues and tracks RECs produced in the ISO-NE control area and imported from adjacent control areas, is governed through a FERC approved committee structure. See *In re New England Power Pool*, 88 FERC ¶ 61079, ¶ 61181 (1999).

Connecticut's VRO program has resulted in a REC product that is capable of being produced only by generators located in the permitted control area because only RECs produced in this area help advance this state's environmental policy goals. This distinguishes such generators from generators located outside of the permitted control area to the point that the entities should not be considered similarly situated for purposes of a claim of facial discrimination under the commerce clause. It bears emphasizing, however, that the geographic restriction in the present case does not entirely ban RECs generated outside of the permitted control area. RECs generated outside of this area can still be sold to any Connecticut entity wishing to buy them, at whatever price the market will bear. Such RECs could, for example, be purchased in this state by a company wishing to " 'green its image.' " *Allco Finance Ltd.* v. *Klee,* supra, 861 F.3d 106 n.17. Accordingly, we conclude that the *Pike* balancing test is the appropriate test to apply to the plaintiffs' claim. See *Pike* v. *Bruce Church, Inc.*, supra, 397 U.S. 142. For the same reasons previously discussed, we concluded that Connecticut's geographic restriction in the VRO program is not clearly excessive in relation to the putative local benefits and, therefore, passes the more permissive *Pike* test.

The plaintiffs nevertheless contend that the analysis in *Allco* is not dispositive in the present case because *Allco* dealt with a challenge to this state's mandatory RPS program and the plaintiffs challenge the voluntary VRO program. As we understand it, the plaintiffs argue that, unlike the mandatory RPS program—in which RPS compliant RECs can be produced only in certain control

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

areas; see General Statutes § 16-245a (b)—RECs for the voluntary, competitive REC market do not need to be generated from any particular area. Although we agree that there are differences between this state's RPS program and this state's VRO program, we disagree that this fact mandates a different outcome than in *Allco*. PURA's rationale for imposing a geographic restriction on VRO RECs is the same that underlies the geographic restriction for RPS RECs—environmental, health, and safety considerations. Just as the RECs used in this state's RPS program are distinct from other RECs because they support this state's clean energy and environmental priorities, so, too, do the RECs that may be used to back a VRO product. Indeed, in its final decision, PURA recognized that there were concerns regarding the geographic restriction: "[PURA] acknowledges concerns about narrowing the eligible regions for VRO and REC only products; however, ensuring environmental benefits support Connecticut's energy policies continues to be a guiding principle for [PURA's] actions. In its first notice of written comments, [PURA] stated that the purpose of this docket was to 'bring Connecticut's VROs in line with Connecticut's goals of reducing local greenhouse gas emissions and supporting sustainable local renewable energy sources. As illustrated in [PURA's] RPS compliance dockets, few current VROs meet these goals.' " Thus, contrary to the plaintiffs' argument, RECs for the VRO program cannot be generated anywhere because such RECs would not further this state's clean energy goals.

We fail to see, and the plaintiffs do not adequately explain, how the voluntary nature of the VRO program renders the RECs generated in the permitted control area the same as RECs generated outside of the permitted control area, which have little to no environmental benefit to this state. PURA's geographic restriction is a goal designed to improve the state's environment and,

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

in turn, the health and safety of Connecticut residents. Because renewable energy generated from distant southern and western states has little environmental benefits to Connecticut, the legislature chose to rely exclusively on RECs issued by NEPOOL GIS for compliance with the RPS program. General Statutes § 16-245a (b) (1) (A). A similar rationale supports PURA's final decision implementing the geographic restriction for VRO RECs. We cannot conclude that any burden imposed by this geographic restriction on interstate commerce, in furtherance of this legitimate state interest, is "clearly excessive in relation to the putative local benefits." *Pike* v. *Bruce Church, Inc.*, supra, 397 U.S. 142; see also *United Haulers Assn., Inc.* v. *Oneida-Herkimer Solid Waste Management Authority*, supra, 550 U.S. 346–47 (plurality opinion) (any incidental burden on interstate commerce that resulted from application of county "flow control" ordinances was not clearly excessive in relation to public benefits provided by ordinances, which increased recycling and conferred "significant health and environmental benefits"). The commerce clause was "never intended to cut the [s]tates off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country." (Internal quotation marks omitted.) *General Motors Corp.* v. *Tracy*, supra, 519 U.S. 306.

Finally, aside from their argument that the geographic restriction burdens renewable generating facilities outside of the permitted control area, the plaintiffs' remaining arguments primarily center on whether the geographic restriction actually advances the state's environmental goals and the restriction's financial impact on electric suppliers operating in this state. We note at the outset that United States Supreme Court Justice Neil M. Gorsuch, writing for himself and two other members of the court, recently rejected the notion

that the *Pike* balancing test authorizes "judges to strike down duly enacted state laws regulating the in-state sale of ordinary consumer goods . . . based on nothing more than [a petitioner's] own assessment of the relevant law's costs and benefits." (Internal quotation marks omitted.) *National Pork Producers Council* v. *Ross*, supra, 143 S. Ct. 1159 (opinion announcing judgment). Moreover, these arguments do not address disparate burdens because they apply to in-state and out-of-state suppliers alike. See, e.g., *Martorelli* v. *Dept. of Transportation*, 316 Conn. 538, 555–56, 114 A.3d 912 (2015) (in dormant commerce clause context, "discrimination simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter" (internal quotation marks omitted)). These arguments also do not address a burden on interstate commerce. In fact, the plaintiffs contend that "the evidence established that the geographic restriction will . . . reduce consumer interest in VROs" sold in this state and "cause prices for [VROs in this state] to significantly rise to levels [at which] customers simply will not buy them." These burdens fall squarely on commerce and consumers within this state. In other words, these burdens are on *intrastate* commerce and not *interstate* commerce. This is not what the dormant commerce clause prohibits. See, e.g., *New Energy Co. of Indiana* v. *Limbach*, 486 U.S. 269, 273–74, 108 S. Ct. 1803, 100 L. Ed. 2d 302 (1988) (dormant commerce clause "prohibits economic protectionism—that is, regulatory measures designed to *benefit in-state economic interests by burdening out-of-state competitors*" (emphasis added)). "The party challenging a law as either clearly discriminatory or violative of *Pike* bears the threshold burden of demonstrating that it has a disparate impact on *interstate commerce*— [t]he fact that it may otherwise affect commerce is not sufficient." (Emphasis added; internal quotation marks

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

omitted.) *Southold* v. *East Hampton*, supra, 477 F.3d 47; see also *United Haulers Assn., Inc.* v. *Oneida-Herkimer Solid Waste Management Authority*, supra, 550 U.S. 345 ("[United States Supreme Court] dormant [c]ommerce [c]lause cases often find discrimination when a [s]tate shifts the costs of regulation to other [s]tates, because when the burden of state regulation falls on interests outside the state, it is unlikely to be alleviated by the operation of those political restraints normally exerted when interests within the state are affected" (internal quotation marks omitted)). Whether the geographic restriction actually advances the state's environmental goals or reduces consumer interests in VROs, moreover, is a consideration most appropriately suited for PURA or the legislature, not this court. See, e.g., *Exxon Corp.* v. *Governor*, 437 U.S. 117, 128, 98 S. Ct. 2207, 57 L. Ed. 2d 91 (1978) ("[i]t may be true that the consuming public will be injured by [the effect of the challenged regulation], but . . . that argument relates to the wisdom of the statute, not to its burden on commerce").

B

Marketing Restriction

The plaintiffs next contend that the marketing restriction violates the dormant commerce clause because it imposes a disproportionate burden on interstate commerce by creating marketing requirements that substantially conflict with a common regulatory scheme. The plaintiffs correctly note that the marketing restriction prohibits electric suppliers from marketing VROs as " 'renewable energy' unless the offer is supported by an ownership interest in or [a power purchase agreement] for a renewable resource used to serve the contract." A VRO not supported by an ownership interest in or a power purchase agreement for renewable resources must be marketed as a product backed REC.

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

The plaintiffs contend that this blanket prohibition on a commonly used industry term—renewable energy— is inconsistent with both federal law and the law of many sister states, which together comprise a common regulatory scheme. For its part, PURA contends that, because the marketing restriction applies equally to in-state and out-of-state suppliers alike, the plaintiffs cannot demonstrate that the marketing restriction has a disparate burden on interstate commerce compared to intrastate commerce. PURA also argues that any purported disparate treatment is not a burden on interstate markets because the marketing restriction does not actually conflict with other states' regulatory programs such that businesses are prevented from complying with both regulatory schemes. PURA notes that there is no cognizable burden on interstate commerce when, as here, the burden is limited to increased compliance costs for firms doing business in more than one state. Finally, PURA contends that, even if the marketing restriction disparately impacted interstate commerce, like the geographic restriction, it, too, has benefits that are not illusory.

The parties agree that the *Pike* balancing test is the applicable standard to evaluate the plaintiffs' challenge to the marketing restriction. As we previously explained, we employ the *Pike* balancing test if a law is nondiscriminatory but, nonetheless, adversely, "incidental[ly]" affects interstate commerce. *Pike* v. *Bruce Church, Inc.*, supra, 397 U.S. 142. When "the statute regulates [evenhandedly] to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. . . . If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local

interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.'' (Citation omitted.) Id. ''For a state statute to run afoul of the *Pike* standard, the statute, at a minimum, must impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce. . . . Under *Pike*, if no such unequal burden [was] shown, a reviewing court need not proceed further.'' (Citations omitted.) *National Electrical Manufacturers Assn.* v. *Sorrell*, 272 F.3d 104, 109 (2d Cir. 2001), cert. denied, 536 U.S. 905, 122 S. Ct. 2358, 153 L. Ed. 2d 180 (2002).

Although several types of burdens on interstate commerce may qualify as ''disparate'' so as to trigger the *Pike* balancing test, the plaintiffs' dormant commerce clause claim regarding the marketing restriction centers around the fact that, according to the plaintiffs, PURA has imposed regulatory requirements that are inconsistent with those of other states and the federal government. Regulations that fall within this category may be said to create interstate regulatory conflicts. ''A state regulation might impose a disproportionate burden on interstate commerce if the regulation is in substantial conflict with a common regulatory scheme in place in other states.'' Id., 112; see also, e.g., *Raymond Motor Transportation, Inc.* v. *Rice*, 434 U.S. 429, 445, 98 S. Ct. 787, 54 L. Ed. 2d 664 (1978); *Bibb* v. *Navajo Freight Lines, Inc.*, 359 U.S. 520, 529–30, 79 S. Ct. 962, 3 L. Ed. 2d 1003 (1959). ''It is not enough to point to a risk of conflicting regulatory regimes in multiple states; there must be an actual conflict between the challenged regulation and those in place in other states.'' *National Electrical Manufacturers Assn.* v. *Sorrell*, supra, 272 F.3d 112; see also, e.g., *Procter & Gamble Co.* v. *Chicago*, 509 F.2d 69, 77 (7th Cir.) (''[t]he [United States] Supreme Court has indicated that in a case involving environmental legislation it is actual conflict, not potential conflict,

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

that is relevant''), cert. denied, 421 U.S. 978, 95 S. Ct. 1980, 44 L. Ed. 2d 470 (1975). On the other hand, there is generally no burden on interstate commerce sufficient to trigger a violation of the dormant commerce clause when the burden is limited to increased compliance costs for firms doing business in more than one state. See, e.g., *Procter & Gamble Co.* v. *Chicago*, supra, 76–77; see also *National Pork Producers Council* v. *Ross*, supra, 143 S. Ct. 1169 (Roberts, C. J., concurring in part and dissenting in part) (''[o]ur precedents have long distinguished the costs of complying with a given state regulation from other economic harms to the interstate market''). This is because the commerce clause is concerned with a law's impact on markets and ''the interstate flow of goods'' and not its impact on individual interstate firms or their profits. See *Pharmaceutical Research & Manufacturers of America* v. *Alameda*, 768 F.3d 1037, 1044–45 (9th Cir. 2014), cert. denied, 575 U.S. 1034, 135 S. Ct. 2348, 192 L. Ed. 2d 160 (2015).

Here, assuming there is a common regulatory scheme,[14] to the extent that the marketing restriction results in disparate treatment, we conclude that the restriction is not in ''substantial conflict'' with the common regulatory scheme. To establish this common regulatory scheme, the plaintiffs point to a Federal Trade Commission guideline, which provides in relevant part that ''[a] marketer should not make unqualified renewable energy claims, directly or by implication, if fossil fuel, or electricity derived from fossil fuel, is used to manufacture any part of the advertised item or is used to

---

[14] The trial court concluded that there was no such common regulatory scheme sufficient to create a dormant commerce clause issue. The court reasoned that to accept the plaintiffs' argument ''would mean that, if just a few states adopt a particular marketing requirement for a product, any state that subsequently decides to adopt a different marketing requirement for the product may not do so lest it violate the dormant commerce clause.'' The Office of Consumer Counsel agrees that the plaintiffs failed to demonstrate that a common regulatory scheme exists.

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

power any part of the advertised service, *unless the marketer has matched such non-renewable energy use with renewable energy certificates*." (Emphasis added.) 16 C.F.R. § 260.15 (a) (2022); see also United States Environmental Protection Agency, supra. Although not referenced by the plaintiffs, the first sentence of subsection (a) of 16 C.F.R. § 260.15 provides that "[i]t is deceptive to misrepresent, directly or by implication, that a product or package is made with renewable energy or that a service uses renewable energy." Thus, although it is deceptive to misrepresent that a product contains renewable energy and that RECs may be used to support a claim that a product contains "renewable energy," there is nothing in this guidance that would prohibit a state from requiring more stringent marketing guidelines on what constitutes "renewable energy." Requiring that a VRO product be supported by an ownership interest in or a power purchase agreement for a renewable resource to qualify as "renewable energy" does not substantially conflict with 16 C.F.R. § 260.15 (a) because nothing in that section forbids a state from enacting more rigorous marketing requirements. In other words, to the extent necessary, the plaintiffs can comply with both the Federal Trade Commission's guideline and the marketing restriction. Thus, there is no "actual conflict" with this guideline. *National Electrical Manufacturers Assn.* v. *Sorrell*, supra, 272 F.3d 112.

The plaintiffs also rely on Vermont regulatory guidance that provides that RECs are "what make solar a green or renewable energy resource—they are . . . the legal attribute of renewable energy. . . . The system of tracking attributes via RECs is the only legal way of characterizing the renewability of different sources of electricity. . . . Whoever buys the RECs has paid an extra cost to bring renewable energy to the grid and

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

has the only legal claim that their energy is renewable.''[15] (Internal quotation marks omitted.) Office of the Attorney General, State of Vermont, Guidance for Third-Party Solar Projects, p. 1, available at https://ago.vermont.gov/ sites/ago/files/wp-content/uploads/2018/01/Guidance-on-Solar-Marketing.pdf (last visited June 26, 2023). This guidance, however, applies only to third-party solar project installers. There is nothing to indicate a similar guidance for electric suppliers. See id., pp. 1–5. Indeed, because Vermont is the only New England state that did not restructure its electricity market, it does not allow retail competition. See United States Energy Information Administration, Vermont State Profile and Energy Estimates (last modified October 20, 2022), available at https://www.eia.gov/state/analysis.php?sid=VT (last visited June 26, 2023). As a result, Vermont does not even have a retail energy market or electric suppliers, and the guidance provided to third-party solar project installers cannot conflict with PURA's marketing restriction for electric suppliers. Moreover, even if PURA's marketing restriction differs from this guidance, the plaintiffs are still able to conduct business in Connecticut and Vermont. The plaintiffs concede as much. PURA's marketing restriction applies only to marketing material within this state; electric suppliers are free to market their REC backed VRO products as "renewable energy" to the extent permitted in Vermont,

---

[15] The plaintiffs also point to Maine and New Hampshire as allowing RECs to be used to substantiate renewable energy marketing claims. See N.H. Rev. Stat. Ann. § 374-F:3 (V) (f) (4) (Cum. Supp. 2019); 65-407-305 Me. Code R. § 4 (A) (7) (2022). It is true that these states allow for the use of RECs to satisfy renewable energy backed programs. The New Hampshire statute, however, does not relate to the marketing of such products. Moreover, to the extent PURA's marketing restriction differs from those of Maine and New Hampshire, the plaintiffs are still able to conduct business in Connecticut and Maine and New Hampshire. That the suppliers may incur some marginal additional cost in creating different marketing materials does not rise to the level of a dormant commerce clause violation. See, e.g., *Procter & Gamble Co.* v. *Chicago*, supra, 509 F.2d 77.

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

or any other jurisdiction. Thus, as with the Federal Trade Commission's guideline, we conclude that there is no "actual conflict" with this guidance. See *National Electrical Manufacturers Assn.* v. *Sorrell*, supra, 272 F.3d 112.

In sum, even if the marketing restriction differs from marketing requirements in other states, it does not violate the *Pike* balancing test because it has no impact on other states' marketing regulations and does not actually conflict with the implementation of other states' regulations. The dormant aspect of the commerce clause does not require that all states treat regulations uniformly, even when there is a common regulatory scheme. Cf. id., 113 ("[t]he idea that there is a general interest in [regulatory] uniformity is inconsistent with our [society's] decision to have separate states with separate legislative competencies, including separate competences to regulate commerce" (internal quotation marks omitted)).

We also conclude that any burden imposed by the marketing restriction on interstate commerce is not "clearly excessive in relation to the putative local benefits." *Pike* v. *Bruce Church, Inc.*, supra, 397 U.S. 142. In its final decision, PURA explained the marketing restriction's local benefits—namely, to improve consumer transparency and further this state's clean energy goals. Specifically, PURA explained: "[PURA] is well aware from its years of customer education and interactions that customers do not understand the concept of a REC. When customers are told they are purchasing renewable energy, they think they are purchasing renewable energy. They are not. They are purchasing a certificate, which purchase provides additional revenue to facilities providing renewable generation, both incentivizing more construction of renewable sources and providing financial assistance to those sources. This is a complex transaction that is being oversimpli-

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

fied by stating that the customer is purchasing renew-
able energy. . . . It is inconceivable to [PURA] that
the [electric suppliers] are arguing that they should
continue perpetuating the inaccuracy. The suppliers'
arguments equate to saying, if [PURA] explains the pro-
cess to customers, then customers will not understand
it. [PURA] does not believe this is true. Customers not
only can understand what they are purchasing, but they
must. If Connecticut is going to meet its clean energy
goals, then customers have the right to understand that
their purchase[s] of local RECs now subsidize those
renewable generation sources and support Connecti-
cut's clean energy goals." These goals are similar to
those that animated PURA's initial development of the
disclosure label in 2008. See General Statutes (Rev. to
2019) § 16-245o; General Statutes § 16-245p. The Office
of Consumer Counsel shares PURA's position on the
need for the marketing restriction. Namely, it argues
that "Connecticut has a substantial interest in ensuring
that consumers understand RECs and how locally
sourced RECs foment forward momentum in achieving
the state's goals related to renewable energy deploy-
ment and carbon reduction."

Apart from asserting that the marketing restriction
is inconsistent with the aforementioned regulations, the
plaintiffs do not clearly articulate the purported burden
it imposes on interstate commerce. Rather, they assert
that "[t]here is no genuine dispute that the burden is
high." Without explication from the plaintiffs on this
point, the only burden this court can conceive of is an
increased financial burden to market their VRO prod-
ucts differently in Connecticut.[16] This was the plaintiffs'

---

[16] The amicus argues that the marketing restriction will burden electric
suppliers because they will be forced to "either own or enter into a [power
purchase agreement] with a renewable generator to be allowed to market
a 'renewable energy' product." The amicus argues that power purchase
agreements are not suitable in the supplier context because "hedges and
internal efficiencies allow suppliers to gain a competitive edge over utilities
as they serve . . . customer contracts [that are much shorter in duration,

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

argument before the trial court—that the marketing restriction would require them to "bear some additional costs when they market their VRO products in Connecticut because their marketing materials will have to be modified relative to what other New England states require." The plaintiffs do not claim that the marketing restriction would prohibit them from doing business in other states. We cannot conclude that whatever incidental expense electric suppliers may incur as a result of the need for different marketing materials outweighs the putative benefits of increased consumer transparency and furthering this state's clean energy goals. See, e.g., *National Pork Producers Council* v. *Ross*, supra, 143 S. Ct. 1154 (rejecting argument that California's Proposition 12 is per se violation of dormant commerce clause because law "will impose substantial new costs on out-of-state pork producers who wish to sell their products in California"); *Procter & Gamble Co.* v. *Chicago*, supra, 509 F.2d 77 (noting that ordinance was "not a burden on interstate commerce . . . but [was] merely a 'burden' on a company [that] happens to have interstate distribution facilities"). Accordingly, we conclude that the marketing restriction passes constitutional muster under the more permissive *Pike* balancing test. See *National Electrical Manufacturers Assn.* v. *Sorrell*, supra, 272 F.3d 112 (rejecting argument that state's labeling requirement unduly burdened "interstate commerce by exposing [certain manufacturers] to the possibility of multiple, inconsistent labeling require-

---

typically six to twenty-four months]. . . . A supplier entering into a [power purchase agreement] would need to raise its prices to hedge against the risks of a long-term contract." There is nothing in the record, and the amicus does not explain, precisely what increased financial burden this would place on electric suppliers. Moreover, electric suppliers do not necessarily have to enter into a power purchase agreement; they may choose to market their [REC only] VRO products in conformity with the marketing restriction. Accordingly, we cannot conclude that this burden is "clearly excessive in relation to the putative local benefits." *Pike* v. *Bruce Church, Inc.*, supra, 397 U.S. 142.

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

ments imposed by other states” because “[i]t is not enough to point to a risk of conflicting regulatory regimes in multiple states; there must be an actual conflict between the challenged regulation and those in place in other states”).

II

FREE SPEECH AND CONTRACT CLAUSE CLAIMS

The plaintiffs raise two additional constitutional claims. First, they contend that the marketing restriction, which prohibits electric suppliers from marketing REC only VROs as containing “renewable energy,” violates their right to free speech under the United States constitution and the Connecticut constitution. Second, they claim that the final decision violates their right to freely contract as guaranteed by the United States constitution because some of the contracts they have with Connecticut consumers include automatic renewal provisions and the restrictions will disrupt the current expectations and obligations of both customers and suppliers under these contracts. PURA contends that the plaintiffs both waived and failed to exhaust their administrative remedies with respect to their free speech and contract clause claims. Specifically, PURA contends that, because the plaintiffs had every opportunity to participate in the contested case and chose not to raise these claims at that time, the plaintiffs failed to exhaust their administrative remedies, and the trial court thus lacked jurisdiction over the claims. Alternatively, PURA contends that the trial court correctly concluded that the plaintiffs waived their free speech and contract clause claims for the same reason. Finally, PURA contends that the plaintiffs’ claims would fail on the merits.

The trial court correctly noted that the plaintiffs did not raise their free speech or contract clause claims during the administrative proceedings before PURA. The court went on to consider whether the plaintiffs’

failure to raise a particular argument before PURA constituted a failure to exhaust administrative remedies or was more akin to a failure to preserve an issue for appellate review. The former is jurisdictional, whereas the latter is prudential. The trial court surveyed various cases from this court and the Appellate Court and concluded that, although no case squarely addressed the question, the cases "strongly imply that a failure to assert a particular argument before an administrative tribunal implicates the waiver doctrine, not the exhaustion of administrative remedies doctrine."[17] The court next considered whether it would have been futile for the plaintiffs to raise their claims before PURA. If so, it would follow that they did not waive their constitutional claims by failing to assert them during the administrative proceeding. The court ultimately concluded that it would not have been futile for the plaintiffs to raise their free speech and contract clause claims before PURA, and, thus, the plaintiffs waived these claims.

Because the exhaustion of administrative remedies doctrine implicates this court's subject matter jurisdiction, we must first decide whether the failure to raise a claim before an administrative agency implicates the exhaustion doctrine. See, e.g., *Stepney, LLC* v. *Fairfield*, 263 Conn. 558, 563, 821 A.2d 725 (2003). "The

---

[17] The trial court noted that two Superior Court decisions have addressed this issue and that one determined that the waiver rule applied and the other determined that the exhaustion doctrine applied. See *Aronow* v. *Freedom of Information Commission*, Docket No. HHB-CV-15-5017072-S, 2018 WL 650381, *3 (Conn. Super. January 5, 2018) (party's failure to raise particular claim before Freedom of Information Commission constituted failure to exhaust administrative remedy, requiring dismissal of that claim), rev'd in part on other grounds, 189 Conn. App. 842, 209 A.3d 695 (2019), cert. denied, 332 Conn. 910, 210 A.3d 566 (2019); *Gerlt* v. *South Windsor Planning & Zoning Commission*, Superior Court, judicial district of New Britain, Complex Litigation Docket, Docket No. X03-HHB-CV-03-0522911-S (April 6, 2005) (39 Conn. L. Rptr. 61, 63) (rejecting argument that failure to raise claim before planning and zoning commission constituted failure to exhaust administrative remedies).

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

doctrine of exhaustion of administrative remedies is well established in the jurisprudence of administrative law. . . . Under that doctrine, a trial court lacks subject matter jurisdiction over an action that seeks a remedy that could be provided through an administrative proceeding, unless and until that remedy has been sought in the administrative forum. . . . In the absence of exhaustion of that remedy, the action must be dismissed." (Citation omitted; internal quotation marks omitted.) *Piteau* v. *Board of Education*, 300 Conn. 667, 678, 15 A.3d 1067 (2011).

"A primary purpose of the doctrine is to foster an orderly process of administrative adjudication and judicial review, offering a reviewing court the benefit of the agency's findings and conclusions. It relieves courts of the burden of prematurely deciding questions that, entrusted to an agency, may receive a satisfactory administrative disposition and avoid the need for judicial review. . . . Moreover, the exhaustion doctrine recognizes the notion, grounded in deference to [the legislature's] delegation of authority to coordinate branches of [g]overnment, that agencies, not the courts, ought to have primary responsibility for the programs that [the legislature] has charged them to administer. . . . Therefore, exhaustion of remedies serves dual functions: it protects the courts from becoming unnecessarily burdened with administrative appeals and it ensures the integrity of the agency's role in administering its statutory responsibilities." (Citations omitted; internal quotation marks omitted.) *Stepney*, *LLC* v. *Fairfield*, supra, 263 Conn. 564–65.

Typically, courts apply the exhaustion of administrative remedies doctrine when a party has completely bypassed an available administrative process. See, e.g., id., 559, 561–63 (direct action against town challenging enforcement of health ordinance was dismissed because plaintiff failed to exhaust administrative remedy before

state board of health). On the other hand, when a party has availed itself of the administrative proceeding but seeks to raise new claims for the first time on appeal, this court generally applies the nonjurisdictional principle that an appellate tribunal is not required to consider a claim unless it was distinctly raised during the administrative proceeding. See, e.g., *Ferraro* v. *Ridgefield European Motors, Inc.*, 313 Conn. 735, 759, 99 A.3d 1114 (2014); *Dragan* v. *Connecticut Medical Examining Board*, 223 Conn. 618, 632, 613 A.2d 739 (1992). We recently explained the distinction between the exhaustion doctrine and the failure to preserve in the context of an administrative appeal. In *Board of Education* v. *Commission on Human Rights & Opportunities*, 344 Conn. 603, 280 A.3d 424 (2022), we explained that "there is a difference between bypassing an administrative procedure on the ground that the agency has no jurisdiction over the matter, which raises an exhaustion issue, and failing, within the context of an administrative proceeding, to preserve for review a claim that the agency has no jurisdiction. *When a party has failed to preserve a claim before an administrative agency, the exhaustion doctrine does not apply; instead, we apply the ordinary rules governing appellate review of unpreserved claims.*" (Emphasis added.) Id., 622–23.

Here, the plaintiffs did not entirely bypass the administrative proceedings before PURA; rather, they failed to raise their free speech and contract clause claims before the agency. Accordingly, we conclude that the plaintiffs' failure to raise these claims during the administrative proceedings before PURA does not constitute a failure to exhaust administrative remedies. Nevertheless, we must determine, as a prudential consideration, whether we should decline to address these claims on the merits because they were not adequately preserved for appellate review.

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

Practice Book § 60-5 provides in relevant part that "[t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial." "Indeed, it is the appellant's responsibility to present such a claim clearly to the trial court so that the trial court may consider it and, if it is meritorious, take appropriate action. That is the basis for the requirement that ordinarily [the appellant] must raise in the trial court the issues that he intends to raise on appeal. . . . This rule applies to appeals from administrative proceedings as well." (Citation omitted; internal quotation marks omitted.) *Ferraro* v. *Ridgefield European Motors, Inc.*, supra, 313 Conn. 759. "A party to an administrative proceeding cannot be allowed to participate fully at hearings and then, on appeal, raise claims that were not asserted before the board [or agency]." *Dragan* v. *Connecticut Medical Examining Board*, supra, 223 Conn. 632. "[T]o allow a court to set aside an agency's determination [on] a ground not theretofore presented . . . deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action." (Internal quotation marks omitted.) *Burnham* v. *Administrator, Unemployment Compensation Act*, 184 Conn. 317, 323, 439 A.2d 1008 (1981).

Although the plaintiffs raised their dormant commerce clause claims before PURA, they failed to raise their free speech and contract clause claims before the agency. The plaintiffs' failure deprived PURA of the opportunity to consider the claims while developing its final decision. PURA is a sophisticated state agency with technical expertise in energy regulations. Had the plaintiffs raised these claims before PURA, the agency may have decided not to adopt the proposed rules or to change the proposed rules to account for any objection it concluded was meritorious. It may not have. But PURA was not afforded the opportunity to consider its proposed final decision in light of these claims. More-

347 Conn. 101        JULY, 2023        149

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

over, because these claims were not raised during the administrative proceedings, the parties were unable to develop a record regarding these claims. In particular, there is no record regarding the contracts between the energy suppliers and customers, which the plaintiffs contend were infringed by the restrictions. No such contracts were entered into the record. Accordingly, we decline to consider the merits of these claims.

The plaintiffs argue, however, that we should review their claims because they are constitutional in nature and PURA did not have the authority to decide the claims.[18] We are not persuaded. Although, as we previously explained, the plaintiffs' failure to raise these claims before PURA does not implicate the exhaustion of administrative remedies doctrine, we find the case law surrounding an exception to the exhaustion doctrine instructive in this context. Relevant to this case, there is an exception to the requirement that a party exhaust its administrative remedies when "recourse to the administrative remedy would be futile or inadequate." (Internal quotation marks omitted.) *Stepney, LLC* v. *Fairfield*, supra, 263 Conn. 565. The plaintiffs essentially argue that it would have been futile to raise these claims before PURA because they are constitutional in nature. We have explained that "[t]he mere allegation of a constitutional violation" is not enough to excuse a plaintiff from raising the alleged constitutional violation before an administrative agency. (Internal quotation marks omitted.) Id., 570. Litigants are excused from raising constitutional claims when it "would be futile because the administrative agency . . . lacks the authority to grant adequate relief." Id.; see also, e.g., *Payne* v. *Fairfield Hills Hospital*, 215 Conn. 675, 680 n.3, 578 A.2d 1025 (1990). If the agency can afford adequate relief, "constitutional and statutory rights . . .

---

[18] We note that the plaintiffs did, however, raise their constitutional dormant commerce clause claims before PURA.

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

can be waived if not asserted in a timely fashion'' before the agency in the administrative proceeding. *Dragan* v. *Connecticut Medical Examining Board*, supra, 223 Conn. 629. The futility exception is typically satisfied when the case "involves a challenge to the constitutionality of the statute or regulation under which an agency operates," because administrative agencies do not have the authority to declare statutes unconstitutional. (Internal quotation marks omitted.) *Stepney*, *LLC* v. *Fairfield*, supra, 570. It is not futile to raise a constitutional claim, however, when, as here, the case challenges "the actions of the board or agency." (Internal quotation marks omitted.) Id. This is because the agency has the authority to cure any potential constitutional defect with its proposed regulations or, in response to those claims, to abandon the proposed regulatory changes altogether if they cannot be modified to address the potential constitutional defect. Thus, we are not persuaded that it would have been futile for the plaintiffs to raise these claims before PURA.

## III

## UAPA CLAIM

Finally, we turn to the plaintiffs' contention that PURA failed to satisfy the procedural requirements of the UAPA. More specifically, the plaintiffs contend that PURA violated the UAPA by (1) relying on "nonevidence" to support its findings and conclusions, and (2) failing to make the parties aware of the information on which it would rely to support its final decision. As to the first asserted violation, the plaintiffs argue that PURA improperly relied on comments from the Office of Consumer Counsel, which stated that its "past interaction with consumers reveals that many have expressed confusion about the VRO program," and on comments submitted by the Department of Energy and Environmental Protection (DEEP), which stated that

"the majority of VRO RECs offered in Connecticut are sourced from outside New England, and their purchase by Connecticut customers does not effectively further Connecticut's public policy goals and may not align with customers' intent when choosing electric supply options beyond the RPS." (Internal quotation marks omitted.) The plaintiffs argue that it was improper for PURA to have relied on these comments because no witness testified in support of these comments, and, therefore, the electric suppliers had no opportunity to cross-examine their veracity and accuracy, as required by the UAPA. As to the second asserted violation, the plaintiffs argue that PURA based its geographic restriction on information about prevailing wind patterns and a University of Connecticut climate overview. The plaintiffs argue that this information was not admitted into the evidentiary record and, as with the unsworn comments, therefore was not subject to challenge.

PURA disagrees and contends that the plaintiffs received full due process under the UAPA. Specifically, PURA emphasizes that it issued three notices requesting written comment, admitted sixty-five entities as parties to the proceeding, gathered data by way of interrogatories to the electric distribution companies and electric suppliers, held both a technical meeting and an evidentiary hearing that the plaintiffs did not attend, received written exceptions, and conducted oral argument. As to the plaintiffs' specific claims, PURA contends that the geographic restriction did not arise from DEEP's comments or the University of Connecticut climate overview. Rather, it was initially proposed by three parties to the contested case in response to PURA's first request for written comments. PURA thereafter incorporated the joint proposal into a straw man proposal in its second notice of request for written comments. At a subsequent hearing, a witness on behalf of two of the entities who proposed the restriction testified

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

in support of the proposal. The witness testified that Connecticut is a tailpipe state, that Connecticut is subject to pollution coming downwind from the west, and that supporting renewable projects in Pennsylvania does more to clean up Connecticut's air than far-flung renewable projects such as those in Canada. As a result, PURA contends that the geographic restriction "developed in plain sight." PURA also notes that Connecticut's status as a tailpipe state was not newly established in this proceeding; rather, PURA had previously reached this conclusion one decade earlier in a separate, contested case. PURA contends that it may properly rely on facts known to it even if they are not presented at the hearing. Finally, PURA rejects the plaintiffs' argument regarding the comments from the Office of Consumer Counsel because (1) PURA did not have to establish that consumer confusion existed in order to modify the disclosure label, (2) even if evidence of consumer confusion was required, it existed in the record on the basis of PURA's review of the disclosure labels used by electric suppliers, and (3) the plaintiffs cannot argue that they were unable to cross-examine a witness at the hearing because the plaintiffs did not attend the hearing.

Relevant to this appeal, the UAPA provides: "(a) In a contested case, each party and the agency conducting the proceeding shall be afforded the opportunity (1) to inspect and copy relevant and material records, papers and documents not in the possession of the party or such agency, except as otherwise provided by federal law or any other provision of the general statutes, and (2) at a hearing, to respond, to cross-examine other parties, intervenors, and witnesses, and to present evidence and argument on all issues involved.

"(b) Persons not named as parties or intervenors may, in the discretion of the presiding officer, be given an opportunity to present oral or written statements. The presiding officer may require any such statement

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

to be given under oath or affirmation.'' General Statutes § 4-177c.

Additionally, we have explained that the conduct of an administrative hearing ''shall not violate the fundamentals of natural justice. . . . Fundamentals of natural justice require that there . . . be due notice of the hearing, and at the hearing no one may be deprived of the right to produce relevant evidence or to cross-examine witnesses produced by his adversary . . . . Put differently, [d]ue process of law requires that the parties involved have an opportunity to know the facts on which the commission is asked to act . . . and to offer rebuttal evidence. . . . The purpose of administrative notice requirements is to allow parties to prepare intelligently for the hearing.'' (Citations omitted; internal quotation marks omitted.) *Grimes* v. *Conservation Commission*, 243 Conn. 266, 273–74, 703 A.2d 101 (1997). ''[Section 4-183 (j)] permits modification or reversal of an agency's decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) [i]n violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error or law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.'' (Internal quotation marks omitted.) *Tele Tech of Connecticut Corp.* v. *Dept. of Public Utility Control*, supra, 270 Conn. 787; accord General Statutes § 4-183 (j). We have stated, however, that ''not all procedural irregularities require a reviewing court to set aside an administrative decision . . . .'' (Internal quotation marks omitted.) *Jutkowitz* v. *Dept. of Health Services*, 220 Conn. 86, 97, 596 A.2d 374 (1991). ''The complaining party has the burden of demonstrating that

Direct Energy Services, LLC *v.* Public Utilities Regulatory Authority

its substantial rights were prejudiced by the error.'' *Tele Tech of Connecticut Corp.* v. *Dept. of Public Utility Control*, supra, 788.

On the basis of our examination of the record and the briefs, and our consideration of the arguments of the parties, we conclude that the plaintiffs cannot prevail on their procedural claims. Specifically, as to the comments from the Office of Consumer Counsel and DEEP, we agree with the trial court that, given that each statement was submitted prior to the hearing, the plaintiffs could have asked, but did not ask, that those statements be offered by a witness at the hearing. The plaintiffs also failed to raise any objection regarding these comments at the hearing. Additionally, the plaintiffs could have provided evidence to rebut these statements at the hearing but did not do so. As to the plaintiffs' contention that they were not aware of certain information on which PURA would rely, we emphasize that PURA should have disclosed that it intended to take notice of scientific facts within the agency's specialized knowledge. See General Statutes § 4-178 (7). However, we agree with the trial court that, in addition to the University of Connecticut climate overview, PURA also relied on the testimony of Maddox, who testified that Connecticut is a tailpipe state and as to the implications of that fact. PURA also relied on its own decisions in prior cases, which also established that Connecticut is a tailpipe state. We find it significant that the plaintiffs had the opportunity to respond to Maddox' testimony and to cross-examine him. We also find it significant that the plaintiffs had the opportunity to respond to PURA's final decision, which included the challenged factual finding and which referenced PURA's earlier decisions in which it reached the same conclusion. Accordingly, we agree with the trial court that, under these circumstances, we ''cannot conclude that the plaintiffs have satisfied their burden of showing that PURA violated

their procedural rights under the UAPA or the common law. Nor can [we] conclude that any violation caused . . . prejudice [to the plaintiffs' substantial rights]."

CONCLUSION

The trial court correctly determined that the geographic and marketing restrictions do not violate the dormant commerce clause. Specifically, as to the geographic restriction, analyzed under the framework set forth in the Second Circuit's *Allco* decision, we conclude that the Connecticut market should be given controlling significance. We also conclude that any burden imposed by either the geographic restriction or the marketing restriction is not "clearly excessive in relation to the putative local benefits" and, therefore, passes the more permissive *Pike* test. See *Pike* v. *Bruce Church, Inc.*, supra, 397 U.S. 142. We also decline to consider the plaintiffs' free speech and contract clause claims because they were not raised before PURA during the administrative proceedings. Finally, we conclude that the plaintiffs failed to satisfy their burden of showing that PURA violated their procedural rights under the UAPA or that any violation caused prejudice to their substantial rights.

The judgment is affirmed.

In this opinion the other justices concurred.

———————————————